Hillsborough, Nov. 7, 1939. } No. 3101.

CLARA B. MORRILL *& a. v.* AMOSKEAG SAVINGS BANK *& a.*

*Thorp & Branch (Mr. Branch* orally), for the plaintiffs.

*Warren, Wilson, McLaughlin & Wiggin* and *Wyman, Starr, Booth, Wadleigh & Langdell (Mr. Wyman* orally), for the defendant Amoskeag Savings Bank.

*McLane, Davis & Carleton (Mr. Carleton* orally), for the defendant Davis.

Woodbury, J. It has for many years been the rule in this state that, in the absence of a statute, the test of the validity of a form of procedure is not the date of its invention (*Walker* v. *Walker*, 63 N. H. 321, 326), but whether or not it is what justice and convenience require. *LaCoss* v. *Lebanon*, 78 N. H. 413, 417, and cases cited; *Hoyt* v. *Insurance Co.*, 80 N. H. 27, 30; *Watkins* v. *Railroad*, 81 N. H. 363, 367; *Derosier* v. *Company*, 82 N. H. 405, 406; *Parker-Young Co.* v. *State*, 83 N. H. 551, 560; *Wisutskie* v. *Malouin*, 88 N. H. 242, 243. It is not necessary, however, for us to consider the legality of the procedure adopted by the trial court in the case at bar because counsel for the plaintiffs made no objection and took no exception to it and this acquiescence on their part amounts to a waiver by them of any

possible irregularity which there may be therein. *Burleigh* v. *Leun,* 83 N. H. 115; *Morin* v. *Insurance Co.,* 85 N. H. 471; *Vidal* v. *Errol,* 86 N. H. 585, 586.

The question before us on this appeal is twofold. It is first, whether there is in the record any evidence of either fraud or duress practiced upon the plaintiffs by the defendants, and second, if such evidence be found, whether it is of such a nature that its acceptance is compelled as a matter of law.

Briefly summarized the facts are as follows. On September 1, 1934, and for many years prior thereto, the plaintiff Morrill was the owner of three parcels of land on South Main and Pleasant Streets in Concord. Two of these parcels, one known as the Foster Block and the other as the Optima Block, were mortgaged to the defendant bank, of which the defendant Davis was treasurer, and the third, known as the Bellevue Block, was mortgaged to the Iona Savings Bank of Tilton. On the above date the interest on both mortgages was considerably in arrears and there was also a substantial sum due for back taxes on all three parcels. This situation prompted the defendant Davis to request both plaintiffs (the plaintiff Payne is the daughter of the plaintiff Morrill), to call to see him at his office in the bank. They came and according to their version of what then transpired, Davis informed them that unless Morrill, who was then well along in years and in poor health, would at once convey the Foster and Optima Blocks to her daughter the bank would be forced to foreclose its mortgage within three weeks. Both plaintiffs assert that no further conversation on the subject was permitted by Davis and that when they started to remonstrate with him, he turned his back and went away.

On September 7, 1934, the plaintiffs consulted an attorney-at-law and he drew for them a warranty deed from Morrill to Payne of both the Foster and Optima Blocks, which Mrs. Morrill then executed, and also a will for Mrs. Payne in which she left these properties to her mother. He also drew an agreement for Mrs. Payne in which she recited that she would keep the above mentioned provision of her will in force and that she would for a consideration hold and manage the properties for her mother's benefit. Both of these latter instruments were duly executed, but their existence was not made known to Davis until many months later. The deed, soon after its execution, was taken by Payne to Davis and he then, according to Payne's testimony, told her that she was in no better position than her mother and that unless she in turn conveyed the properties to him to hold in trust for

her, her mother and the bank, the bank would proceed with its fore-closure. Mrs. Payne acceded to this proposal and accordingly on October 19, a deed from her to Davis was prepared and also a de-claration of trust by him.

This trust agreement, after reciting the above conveyance of the properties by Payne to Davis and the mortgage thereon, went on to provide that Davis was to hold them in trust with full power in his sole discretion to manage, control, lease and let them or any part of them upon such terms and conditions and for such rental as he might deem best, that he was to collect the rents and income therefrom, and that he, also in his sole discretion, might make improvements and additions thereto. The instrument also gave Davis power and authority to pay all bills for taxes, insurance and other charges against the property then due, and to borrow on the security of the property such sums as might be necessary for any of the foregoing purposes, he to "be allowed or credited interest upon all such pay-ments at the rate of six per cent per annum computed semi-annually." Out of the gross income of the properties Davis was to "deduct five per cent thereof as his compensation for services," and he was to pay "all taxes, water rates, charges for insurance and repairs, and all other reasonable and necessary expenses in connection with the management and operation of said property." Any balance of income remaining after the above payments was to be allocated by Davis, in his sole discretion as to amounts, to the payments of principal and interest on the sums borrowed or furnished by him and to the pay-ment of the principal, with interest at the rate of six per cent, on the mortgage to the defendant bank. It was further agreed by Davis that if Payne within ten years paid "all sums expended by him as aforesaid, with interest as aforesaid, together with the full amount then due said Amoskeag Savings Bank as aforesaid, and all other charges or expenses incurred by him less the deductions herein pro-vided," that he would reconvey the properties to her, but, if she should make all the above payments within five years, then Davis was to receive "as additional compensation for his services, five per cent of the total amount expended by him for additions and repairs to and upon said property." In default of redemption by Payne within ten years Davis agreed to convey the properties at the end of that time to the defendant bank. The trust instrument concludes with an agreement by Davis to render semi-annual accounts of his stewardship and with a recitation to the effect that both Payne and the bank agree "to the foregoing trust and to the terms and conditions

hereinbefore set forth." The plaintiff Payne signed and acknowledged the instrument and so did the defendant Davis and his wife, but, although provision was made for signature by the bank, no one signed in its behalf.

At the time when the above trust was created the Foster Block was old and in bad repair and the trustee procured an estimate from a reputable contractor as to the cost of needed repairs and renovation. This cost, in the trustee's opinion, was so great, considering the age of the building, as to be unwarranted and so instead of repairing it he had it razed and a new one built in its place at a cost of approximately forty thousand dollars. The cost of this new building was, in the first instance, defrayed by a construction loan from the bank to Davis in his capacity as trustee.

During the early fall of 1935 it was agreed that the Bellevue Block should also be included in the trust. To accomplish this Mrs. Morrill conveyed it to her daughter and Mrs. Payne conveyed it to Davis who in turn executed a second declaration of trust. This second trust instrument was in all material respects similar to the earlier one except that in it the defendant bank was not mentioned and that it provided that if Mrs. Payne did not redeem within the ten year period provided for, the trust should terminate and the property "vest in said Davis absolutely and in fee, and free of all trusts, subject to any mortgage indebtedness then existing." The price agreed upon for this property was sixteen thousand dollars, eighteen hundred dollars of which was raised by Mrs. Payne (she gave her note to her mother in that amount), and the balance was raised by Mr. Davis on a mortgage of all three properties to be described hereafter. Out of this purchase price the mortgage to the Iona Savings Bank, with its arrears of interest, was paid and that bank gave its discharge, and also out of this price the arrears in taxes were fully paid. The balance was paid to Mrs. Morrill. These two deeds and the second trust agreement were executed on September 10, 1935.

On September 17, 1935, all the indebtedness of every sort upon all of the properties, that is, the indebtedness incurred by Davis as trustee in relation to the Foster and Optima Blocks, including the cost of new construction, and the balance of the purchase price of the Bellevue Block, was consolidated in a mortgage of all three properties by Davis to the defendant bank in the sum of $84,000, and the original mortgage of the Foster and Optima buildings to that bank was discharged. About eighteen months later this blanket mortgage was fully paid by Davis and discharged by the bank so that the

properties then stood and now stand free and clear of any encumbrance. The money to pay this mortgage was raised by Davis personally on a loan from another bank secured by a pledge of his own personal collateral.

The duress of which the plaintiffs complain with respect to the Foster and Optima Blocks (there is no evidence of any pressure exerted to induce the transactions with respect to the Bellevue Block), is that Davis used his position as treasurer of the defendant bank to threaten foreclosure of the original mortgage on those properties and thereby forced, first, a conveyance of them by Mrs. Morrill to her daughter, and second, a conveyance of them by the daughter, Mrs. Payne, not to the mortgagee bank, but to himself as trustee under an instrument which the plaintiffs characterize in their brief as "iniquitous and unconscionable."

Duress, under the early common law, might consist in threats as well as in the use of actual force, but only four kinds of threats were regarded as of sufficient gravity to permit one to avoid the consequences of his acts. These were threats of loss of life, of loss of limb, of mayhem, and of imprisonment. Even a threatened battery was not sufficient, and if the threat was of imprisonment, it must be of an unlawful imprisonment. *Richardson* v. *Duncan*, 3 N. H. 508; *Alexander* v. *Pierce*, 10 N. H. 494; 5 Williston, Contracts (*Rev. Ed.*) *s.* 1601. Furthermore, the threat must be "such as to put a brave man in fear," (*Ib. s.* 1605) or such as "to deprive a constant or courageous man of his free will." 17 Am. Jur., Duress, *s.* 10.

These rigid limitations of the early law have now been very generally abandoned. In this state an act procured by a threat of criminal prosecution is obtained by duress even though the threatened criminal action would be justified (*Clark* v. *Tilton*, 74 N. H. 330), and such a threat may also amount to duress if made against a spouse. *Farmington Savings Bank* v. *Buzzell*, 61 N. H. 612. Elsewhere, (we find no New Hampshire cases on the subject) some threatened injuries to property, if wrongful and made under certain circumstances, appear very generally to be held to constitute duress (79 A. L. R. 655; 17 Am. Jur., Duress, *s.* 6; 2 Am. Law Inst., Restatement of Contracts, *s.* 493), and the threat need no longer be such as to put a brave man or even a man of ordinary firmness in fear, but are enough if they in fact put the actor, considering his age, sex, the relation of the parties and the attendant circumstances, in such fear as to preclude the exercise by him of his free will and judgment. 2 Am. Law Inst., Restatement of Contracts, *s.* 492 *comment a.*; 17 Am. Jur.,

Duress, *s.* 11; 5 Williston, Contracts, (*Rev. Ed.*) *s.* 1605. In fact, the law of duress has been so broadened in recent years that in some of the leading cases on the subject cited in the above texts the courts have carefully refrained from attempting any definition of it but have said that the outcome of each case will have to depend upon its own circumstances. *Joannin* v. *Ogilvie*, 49 Minn. 564; *Adams* v. *Bank*, 116 N. Y. 606. See also cases cited in the note to *Kilpatrick* v. *Insurance Co.*, 183 N. Y. 163, in 2 L. R. A. (N. S.) 574; 5 Williston, Contracts (*Rev. Ed.*) *s.* 1603.

There are, however, certain very well defined limits to the doctrine of duress. It has long been the rule here as well as elsewhere that a threat to bring a civil action does not constitute duress if the threat is made in good faith, that is, in the honest belief that a good cause of action exists (*Evans* v. *Gale*, 18 N. H. 397; *Morse* v. *Whitcher*, 64 N. H. 591), and similarly it is not duress to threaten resort to the remedies given by a contract or to foreclose a mortgage if it is in default. 5 Williston, Contracts, (*Rev. Ed.*) *ss.* 1606, 1607; 17 Am. Jur., Duress, *s.* 17. Neither is it duress "when a party is constrained to enter into a transaction by vexation and annoyance or by force of circumstances for which the other party is not responsible," (5 Williston, Contracts, (*Rev. Ed.*) *s.* 1608), and (*Ib.* 1618) "certainly there is no broad doctrine forbidding a person from taking advantage of the adversity of another to drive a hard bargain."

However, classified with cases of duress are those in which a person in straitened circumstances is induced to pay money which he does not owe or to do something which he is under no obligation to do by reason of the threats of another to take action which the law permits him to take. Typical of cases of this sort are those in which a mortgagee threatens to foreclose a mortgage in default unless the mortgagor agrees to pay or pays a bonus. 5 Williston, Contracts (*Rev. Ed.*) *s.* 1618. But, since duress implies the exertion of wrongful pressure to induce a transaction (2 Am. Law Inst., Restatement of Contracts *s.* 492), cases of this latter sort, there being nothing wrongful in the action threatened, are really not cases of duress at all. The vice in them, if any there be (*Smith* v. *Smith*, 82 N. H. 399), lies not in the inception of the transaction but in the transaction itself, and relief is or should be given upon this latter ground, that is, upon the broad ground of illegality.

It is evident from the foregoing discussion that any concrete definition of duress, as that term is now used by courts and text writers, is impossible. However, omitting duress by force exerted

or threats made against the person, a type of duress not here involved, it is possible to deduce from the cases three general rules with respect to duress by threats to property. In the first place the consent given must be the result of the coercion exerted. That is, it must appear that the consent was actually induced by the pressure applied and would not have been given otherwise. In the second place this pressure does not now have to be such as to overcome the will of a brave or courageous man, or even that of a man of ordinary firmness, but is sufficient if it in fact overcomes the will of the person against whom it is applied. And, in the third place, the pressure must be wrongful, that is, there must be some threat to do something harmful which the threatening party has no legal right to do.

Considering the findable facts in the case at bar in the light of the above rules it is evident that no duress was practiced upon either of the plaintiffs with respect to any of the properties. Not only is there nothing in the record to indicate that the conveyances of the Bellevue Block and the trust with regard thereto were induced by any undue pressure applied by Davis, but it might also be found that the transactions with respect to this property were voluntarily entered into if not actually instigated by the plaintiffs. With respect to the Foster and Optima Blocks the only findable persuasion used was the threat by Davis, who from the plaintiffs' evidence was understood by them to be acting at that time as an officer of the bank, to foreclose a mortgage already in default. Since this was a course of action legally open to the mortgagee, it is immaterial from the standpoint of the law of duress that foreclosure would result, due to the plaintiffs' straitened financial circumstances, in serious loss to them and it is also immaterial from this standpoint whether Davis was then in fact acting as an individual or as an agent of the bank. *Jones* v. *Houghton*, 61 N. H. 51. The defendant Davis acting within the scope of his authority for the defendant bank threatened to do no more than the bank had a legal right to do and such conduct cannot be made the basis for a finding of duress. The question remains, however, whether the plaintiffs, or either of them, are entitled to relief from either declaration of trust on the ground of illegality.

It has long been the law in this state that contracts may be declared void because unconscionable and oppressive (*Houghton* v. *Page*, 2 N. H. 42, 44; *Smith* v. *Smith*, 82 N. H. 399, 401; see also *Bither* v. *Packard*, 115 Me. 306; *Russell* v. *Southard*, 12 Howard 139; *Villa* v. *Rodriguez*, 12 Wallace 323) and the plaintiffs assert that the trust agreements are unconscionable, oppressive, unjust and unfair in three

respects. The first of these is that the trustee "insisted on absolute, unquestioned control and management of the property;" the second is that in addition to his compensation of five per cent of the gross income from the property, he was to be paid from the trust six per cent on all money borrowed by him for the purposes of the trust regardless of the rate which he was in fact required to pay therefor; and, third, that he was to have, in addition to the foregoing compensation, five per cent of the cost of new construction and repairs in the event that Mrs. Payne redeemed the properties within five years.

We find nothing unjust or oppressive in the provision of the trust instruments giving the trustee full powers of control and management of the properties conveyed to him. Broad powers of this sort are not only essential to the creation of a trust (2 Scott, Trusts, s. 175), but they are also commonly included in trust instruments for the obvious reason that they are essential to efficient administration. We see no reason to strike down the trusts upon this ground.

The second and third grounds of alleged illegality are that the trustee stipulated for excessive compensation. While it is true that the compensation given to the trustee is greater than that ordinarily provided, it is also true that the duties required of him were more than ordinarily onerous. He assumed the management of old buildings which were operating at an annual deficit in a city eighteen miles distant and one of those buildings he knew to be in immediate need of extensive repairs if not of rebuilding. The premises consisted of stores, offices and apartments several of which were vacant and some of which were in need of minor repairs. He was under obligation to provide heat for the buildings, and in consequence to buy fuel and to provide janitor service, and he was called upon to collect rents from and otherwise to deal with many tenants. Under these circumstances the management of the properties called for the exercise of considerable business acumen as well as the expenditure of much time and effort and we cannot say that the added inducement of extra compensation for the trustee's services was so great as to render the trusts unconscionable as a matter of law.

With respect to the second trust instrument it is argued that its provision vesting title to the Bellevue Building in the trustee in default of redemption renders that instrument invalid. This argument is without merit as to Mrs. Morrill because she was paid a price for it which was findably fair and relinquished all her rights therein. It is also without merit as to Mrs. Payne. She was never the beneficial owner of the premises but served only as a step in the

transfer of title from her mother to the bank. She did contribute her note for eighteen hundred dollars toward the purchase price but she retained no lien on the premises and from all that appears was willing to make this contribution in order to induce Mr. Davis to accept the management of that property under the terms of the trust. What she did, she appears to have done voluntarily. Under these circumstances it was not oppressive as a matter of law for the trustee to demand as compensation title to the property in default of redemption and subject to the mortgage from which the balance of the purchase price was derived.

The question of fraud remains to be considered. The only fraudulent act relied upon by the plaintiffs with respect to Davis' transactions with Mrs. Morrill is that he falsely assured her when he requested the conveyance of the Foster and Optima Blocks to her daughter that the mortgage situation would thereby be corrected to the satisfaction of the bank. This is not and could not in reason be understood as tantamount to a statement that the mortgage would thereby be satisfied. At the most it was only an assurance that the bank would, in the event of the conveyance, forbear to foreclose, and even if such statement was made, (it was denied by Davis) and even though it was false in the sense that the bank never bound itself to forbear, still it resulted in no loss to the plaintiffs, or either of them, because the bank never did in fact foreclose or attempt to foreclose its mortgage and both mortgages to that bank have been paid and discharged.

With respect to the dealings of Davis with Mrs. Payne several allegations of fraud are made. To consider them in detail would expand this opinion unduly. It suffices to say that a careful reading of the record and the exhibits indicates that the finding of their lack of merit by the court below is amply justified. As to some of them the evidence is conflicting. Others are based entirely upon the testimony of Mrs. Payne and her testimony is so contradictory and so at variance with her letters put in evidence as exhibits by the defendants as to justify the court in disbelieving her. Other allegations of fraud have to do with alleged irregularities of Davis in his dealings with the bank of which he was treasurer. We are unable to see how such irregularities, if proved, operate to give cause for complaint by this plaintiff.

However, Mrs. Payne, in her own sworn testimony admits that she gave Mr. Davis a false statement of the income from the property for the purpose of inducing him to believe that the income did

368

not exceed the expenses of operation so that she could retain in her own hands a balance of rents which she had collected from him as his agent. Such conduct on her part is sufficient to invoke the rule denying equitable relief to one who does not come into a court of equity with clean hands. Furthermore, and this is a complete answer to all of the contentions here made by Mrs. Payne, it appears that she had full knowledge of all the transactions, and was fully cognizant of all that was being done by Davis with respect to the property during the period from the first of September, 1934, until this suit was brought. During all of this time she not only acquiesced in all that he was doing, but assisted him therein. What she did amounted to an acceptance of the trusts with full knowledge of their provisions and bars her from the relief which she seeks for the reason that one may not, with full knowledge of all the circumstances surrounding the inception of a transaction elect to treat it as valid while there remains a prospect of profit therefrom and only when hope of profit has faded, seek to rescind on the ground of fraud or duress. *Weeks* v. *Robie,* 42 N. H. 316; *Record* v. *Company,* 89 N. H. 1, 11, 12.

*Exception overruled.*

BRANCH, J., did not sit: the others concurred.