James H. MOLLOY and John D. Wilson, individually and as stockholders of Claremont Paper Corporation, on behalf of and for the benefit of said Corporation, and Lynham Industrial Corporation, Plaintiffs,

v.

BEMIS BRO. BAG COMPANY and Claremont Paper Corporation, Defendants.

No. C–1565.

United States District Court
D. New Hampshire.

June 23, 1959.

William A. Roberts and Philip S. Jessup, Washington, D. C., and Robert D. Branch, Concord, N. H., for plaintiffs.

Joseph N. Welch, James D. St. Clair, and Anthony Brayton, Boston, Mass., and William J. Starr, Jr., Manchester, N. H., for defendant Bemis Bro. Bag Co.

J. Leonard Sweeney, Nashua, N. H., for defendant Claremont Paper Corp.

HOLTZOFF, District Judge (sitting by designation).

This is the trial of an action brought by two stockholders of the Claremont Paper Corporation, a corporation organized and existing under the laws of the State of New Hampshire, which had owned a paper mill located at Claremont, New Hampshire. The suit seeks to set aside certain corporate transactions affecting the company. The action is brought by the two stockholders in part in their own individual rights and in part as minority stockholders suing in behalf of the corporation in their representative capacity. There is a third plaintiff, Lynham Industrial Corporation, which seeks redress for injuries alleged to have been caused to it by the termination of a contract between it and Claremont by which Lynham had been made a sales agent for Claremont.

The complaint is a tangled web in which numerous facts and details are interwoven in a manner that makes the pleadings somewhat obscure and difficult. It is somewhat perplexing to discern from the face of the complaint the precise claims for relief. Accordingly, at the

conclusion of the opening statements of counsel the Court interrogated counsel at some length concerning their respective contentions; thereby, in effect, conducting what amounted to a pre-trial. This course was pursued in order to sift out and classify the allegations of fact and to ascertain and crystallize the issues of the case.

As a result three distinct causes of action or claims for relief emerged and the trial proceeded in respect to each of them. First, a cause of action was asserted by the plaintiffs James H. Molloy and John D. Wilson, in their individual capacities as stockholders of the defendant Claremont Paper Corporation, which was joined as a nominal defendant, to set aside a settlement agreement made with the individual plaintiffs by the defendant Bemis Bro. Bag Company, by which the individual plaintiffs parted with a large part of their capital stock in the Claremont Paper Corporation, thereby losing majority control of the company. It is charged that the signatures of the individual plaintiffs to the settlement agreement were procured by duress.

The second cause of action is one asserted by Lynham Industrial Corporation for damages for alleged interference with contract rights, in that the defendant Bemis Bro. Bag Company caused Claremont to terminate its sales contract with Lynham.

The third cause of action is a derivative claim asserted by the individual plaintiffs as minority stockholders of Claremont in behalf of the corporation to set aside a liquidation sale of all of the assets of the company to the defendant, Bemis Bro. Bag Company. It is charged first that the sale was brought about by fraud committed by the defendant; and, second, that the vote at the stockholders' meeting at which the sale was authorized was illegal in that the proxy of the majority stockholders used at the meeting was invalid under the New Hampshire statute.

As is so often the case with a series of inter-corporate transactions, the facts are somewhat involved. The salient events can, however, be summarized with some degree of brevity.

Early in 1946 there was in existence a New Hampshire corporation known as the Claremont Paper Company, which owned and had successfully operated for a number of years a paper mill at Claremont, New Hampshire. One William A. Kirn was the president and sole stockholder of the company. The plaintiff, James H. Molloy, is a lawyer, apparently with some knowledge and experience in finance and promotion of business enterprises. The plaintiff, John D. Wilson, had been engaged throughout his career in the paper industry and was thoroughly familiar with that business and especially with the sale of paper.

At about that time Molloy and Wilson, together with one Gerard, entered into a joint venture. They adopted the name of Wilson Industry Associates and after some readjustments were made in their respective proportions each member of the group had a one-third interest in the common enterprise. Each invested $333 so that the Associates together had a capital of $1,000. Their objective was to acquire the Claremont Paper Company as well as possibly to undertake other similar enterprises.

The plaintiff, Molloy, engaged in a series of negotiations with Kirn, which resulted on March 16, 1946, in obtaining an option from Kirn whereby the Associates were accorded the right to purchase all of the assets of Claremont Paper Company for $1,140,000. This option was accompanied by a stipulation that the purchaser of the assets was to employ Kirn as general manager at a salary of not less than $25,000 a year.

We now turn to the defendant Bemis Bro. Bag Company. This concern was a large manufacturer of paper bags. It was at the time in question desirous of procuring additional sources of supply of paper. Accordingly, the Associates entered into negotiations with the representatives of Bemis which culminated on April 1, 1946, in a contract between them. Pursuant to this agreement the Associ-

ates undertook to form a new company to which their option to purchase the Claremont assets was to be transferred. This company was to purchase the Claremont mill and the other assets of the company. The new company was to have a paid-in cash capital of $1,000, which the Associates were to supply. In order to finance the operations of the new company, Bemis agreed to lend to it the sum of $900,000 at three percent interest to be amortized at the rate of $15,000 every three months. In addition, all net income of the company in excess of $100,000 per annum was to be paid to Bemis on account of the loan until the loan was repaid. The new company on its part was to agree to sell and deliver to Bemis 9,000 tons of paper a year for a period of five years with the right of renewal. The price to be paid by Bemis for the paper was to be the average price paid by Bemis for paper of like quality and quantity bought from others.

The Associates immediately proceeded to organize a new corporation under the laws of the State of New Hampshire which was known as Claremont Paper Corporation as distinguished from Claremont Paper Company, which was the appellation of the old company. Each of the Associates received substantially one-third of the stock of the new corporation. The transactions contemplated by the agreement between the Associates and Bemis immediately followed. On May 8, 1946, Bemis advanced to the company $900,000 for which it received a promissory note secured by a mortgage on all of its property. The balance of the purchase price for the mill and the other assets of the old company was financed by means of a loan of $350,000 borrowed from a bank. This loan was immediately repaid in the space of two or three hours out of the cash in the treasury of the new company because the assets of the old company which were transferred to the new included not only the mill and some physical assets, but also accounts receivable and cash. Simultaneously with this transaction the contract for the sale and delivery of paper by Claremont to Bemis, as previously indicated, was executed.

It should also be noted that the mortgage given by Claremont to Bemis secured not only the repayment of the loan, but expressly by its terms also guaranteed the performance of the contract for the sale and delivery of paper.

Claremont Paper Corporation then began operating the mill. Kirn continued as president of the new company and as manager of the mill at Claremont, New Hampshire. John D. Wilson, one of the Associates, devoted his full time to the enterprise and was employed at a considerable salary. He took charge of the sales office of the company, which was located in New York.

Nominal capacity of the mill was 15,000 tons of paper a year and, as heretofore stated, of this quantity 9,000 tons was to be sold and delivered to Bemis. For the excess capacity of 6,000 tons Wilson proceeded to develop new products. At the time in question Federal price regulations were in effect as a war measure. The Office of Price Administration, which administered the regulations, allowed higher prices to be charged for new products than had been permitted in respect to products previously marketed by Claremont.

Wilson then organized a separate corporation under the laws of the State of New York, known as Claremont Paper Corporation of New York. The New York corporation acted as sales agent for the New Hampshire corporation rather than the New Hampshire corporation making its sales directly. Instead of putting the stock of Claremont of New York into the treasury of Claremont of New Hampshire, the plaintiff Wilson took the stock for himself and presumably also for his associates, or at least, for one of them, the plaintiff Molloy.

Apparently when Bemis ascertained this scheme, it was considerably chagrined, because by this operation most of the profits on sales inured to the benefit of Claremont of New York instead of

to Claremont of New Hampshire. This method of doing business tended to frustrate the benefit of the provision which required the net income of Claremont of New Hampshire in excess of $100,000 per annum to be paid to Bemis on account of repayment of its loan.

In the course of time a disagreement arose between Bemis and Claremont of New Hampshire as to the method of computing the price to be charged to Bemis for the paper delivered to it by Claremont. This controversy was disposed of by arbitration. It does not require further discussion for the purposes of this trial.

Evidently, to the disappointment of Bemis, Claremont did not fulfill its obligations to deliver to Bemis 9,000 tons of paper a year at the rate of 750 tons a month. It must be repeated that the principal purpose of Bemis in entering into this transaction and advancing $900,000 at a low rate of interest was to secure for itself additional sources of supply of paper. Considerable shortages in the amounts of paper due to Bemis accumulated. Bemis pressed for additional deliveries. Claremont replied that it was incapable of doing so because it was unable to obtain an adequate supply from its regular sources and pointed to the provision of the sales contract found in Paragraph 6 to the effect that the seller's inability to obtain an adequate supply from its regular source excused the seller for failure to deliver. Bemis, on the other hand, contended that what Claremont was doing was to divert some of its supply into higher and more profitable grades of paper, instead of fulfilling its obligations to Bemis. Whether there was a default on the part of Claremont in this respect is not an issue to be determined at this trial or in this case, as this Court views the issues. It must be said, however, that there is some evidence that tends to support the contentions of Bemis in this regard.

On September 16, 1948, Bemis filed suit in the Superior Court of New Hampshire, Sullivan County, to foreclose its mortgage, alleging as a principal default the failure of Claremont to sell and deliver to Bemis the paper called for by the agreement. · Simultaneously, in accordance with the local procedure, the plaintiff in the foreclosure action attached the New Hampshire bank account of Claremont. It may be said in passing that the cash balance in that account at the time approximated $100,000. In addition Claremont had another bank account in New York, in a New York bank, which, of course, could not be attached in the New Hampshire action.

The attachment was levied on a Thursday. Four days later, on September 20, 1948, a stipulation was signed by the parties and filed in court lifting the attachment, in part. The stipulation released from the attachment such portions of the funds as might be needed for the normal operation of the business of the company when no other funds were available. This release was to be made from time to time on request of William A. Kirn. The stipulation provided that Kirn only should sign checks for Claremont and that Kirn should continue to operate the business. Consequently, except for a few days over a week-end, the attachment did not interfere with the conduct of the business of the company.

Molloy caused counsel to be retained in behalf of the company, to file an answer in the foreclosure suit, denying all the allegations of the bill of complaint. Thus under the pleadings it was open to Claremont to litigate the question whether it had been in default and whether the mortgage was due.

Instead of proceeding to trial, however, a series of conferences took place between representatives of Claremont and Bemis and other interested parties. These conferences culminated in a settlement contract which was executed in Boston, Massachusetts, on October 19, 1948, a little over a month after the foreclosure suit was filed. This settlement contract disposed of the foreclosure suit which was later formally dismissed.

The agreement is rather lengthy. Its principal pertinent provisions are as follows. Molloy, Wilson and Gerard trans-

ferred to Bemis a majority of their stock in Claremont of New Hampshire, retaining only a minority interest. Specifically, out of 1,000 shares, 520 shares were transferred by the three Associates to Bemis. Molloy and Wilson retained 320 shares. Bemis, later, acquired 160 shares from the third Associate, Gerard, so that Bemis became the holder of record of more than two-thirds of the stock of the company. Molloy and Wilson, however, were given the privilege in this agreement of recapturing a large portion of the stock that they turned over to Bemis within a year if all amounts due to Bemis were repaid. Wilson, by the settlement agreement, assigned to Claremont of New Hampshire all of his stock in Claremont of New York. The sales contract with Bemis was cancelled. The claims of Bemis against Claremont were settled by an agreement to sell and deliver to Bemis at a specified price 1,200 tons of paper in certain installments. It was agreed that Claremont of New Hampshire would enter into a contract with a concern known as the Crown Mark Paper Corporation, or its successor, under which the Crown Mark or its successor would have the right to act as selling agent for Claremont of New Hampshire at a five percent commission. It was provided that such contract might be terminated at any time on 90-days' notice.

Finally, Bemis agreed to advance to Claremont of New Hampshire the sum of $200,000 additional working capital.

We now come to the first cause of action, namely, the cause of action asserted by Molloy and Wilson in their individual capacities as stockholders of Claremont Paper Corporation, to set aside the settlement contract on the ground that their adherence to the agreement was procured by duress. They do not claim of course that there was any physical duress, but they contend that there was what is known in the law as economic duress.

Before proceeding with a discussion of this cause of action, it is necessary to determine and ascertain the law that governs the rights of the parties. Since this action does not involve a Federal question, the substantive law of the appropriate State applies.

The pertinent rule of conflict of laws is determined by the law of the forum, in this case New Hampshire. This was decided by the Supreme Court in Klaxon Co. v. Stentor Electric Manufacturing Co., 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477. We must therefore first turn to the law of New Hampshire in order to ascertain what principles govern matters relating to duress in the execution of a contract. This is a matter that goes directly to the validity of the contract. It was held in the case of Hall v. Costello, 48 N.H. 176, 179, that "the general rule is that the contract with respect to its construction and import is to be governed by the law of the country or the State in which it is to be executed". The rule varies, however, when the contract is executed in one State, but is to be performed in another. In that event, it is the New Hampshire rule that the validity of the contract is to be determined by the law of the place in which it is intended to be performed, Bliss v. Houghton, 16 N.H. 90. This case is complicated by the fact, however, that while the settlement contract was executed in Massachusetts, it was to be performed in part in Massachusetts and in part in New Hampshire. A baffling problem might be presented on this aspect of the case, were it not for the fact that the law of Massachusetts and the law of New Hampshire on the subject of duress in the making of a contract appear to be the same.

There is no doubt that the early common-law doctrine of duress has been greatly expanded and has broken through its original limitations. Many States have adopted the modern concept known as economic duress, which is at times called "business compulsion". Both Massachusetts and New Hampshire have accepted this principle. Carew v. Rutherford, 106 Mass. 1, at page 12; Morrill v. Amoskeag Savings Bank, 90 N.H. 358, 9 A.2d 519. The last-mentioned case contains an excellent summary of the doctrine. In that case Mr. Justice Wood-

bury stated (90 N.H. at page 363, 9 A.2d at page 524):

> "Duress, under the early common law might consist in threats as well as in the use of actual force, but only four kinds of threats were regarded as of sufficient gravity to permit one to avoid the consequences of his acts. These were threats of loss of life, of loss of limb, of mayhem, and of imprisonment."

The Court went on to say that "These rigid limitations of the early law have now been generally abandoned". The Court proceeded to state, however, that there were certain very well-defined limits to the doctrine of economic duress, and that the bringing of a law suit does not constitute duress if this is done in good faith. The Court specifically points out that if it were open to a mortgagee to bring a foreclosure suit, such a course would not constitute duress even if foreclosure would result, due to the mortgagor's straitened financial circumstances and a serious loss would be caused to him.

██ A lawful assertion of a legal right is not duress no matter how harsh it may be in its effects. So, too, the fact that a contract may be exceedingly disadvantageous to the person who executes it is not sufficient to constitute duress.

In the instant case, if Claremont of New Hampshire had a good defense to the foreclosure suit, it could have brought the matter to trial and contested the right to foreclose. In fact counsel had filed an answer denying the allegations of the bill of complaint, and the attachment was lifted to the extent of permitting the business to continue to operate free from its shackles in the meantime. On the other hand, if there was no defense to the action and it had proceeded to judgment, foreclosure would have completely wiped out the interests of the individual plaintiffs. By executing the settlement agreement they salvaged considerable out of the wreck that seemed to be imminent to them.

The testimony of the plaintiff Molloy was very illuminating on this point and tends to refute the present contention that his adherence to the agreement was procured by duress. He testified as follows (Transcript, p. 185):

> "I felt that we were just handcuffed, by force of the attachment facilities that had been put on us in New Hampshire and on our bank accounts and that we were threatened with either settling or they would go ahead and proceed and wipe the thing out if they could. However, in that connection, I expressly warned them immediately before and after the signing of this agreement that certain things, if certain things were not so, I would not sign it. They were represented to me as being so. Therefore, I did sign it. They were considerations to me, by representation to me, which induced me to sign this agreement, and part with my portion of stocks that were turned over to me."

Then, again he testified concerning the final conference at which the settlement contract was signed (Transcript p. 188):

> "I asked that Mr. Gerard be brought in. I asked that Mr. Gerard be brought into the meeting. Mr. Gerard was brought in and he was seated at a table. I announced to everyone that I was going to ask Mr. Gerard a question. And I was announcing then and there that if Mr. Gerard answered that question in the affirmative, or if he qualified his answer of a negative nature, that I would not sign that agreement and that I would fight the case to the end in the County Court."

And continuing:

> "The question that was posed to Mr. Gerard was whether he had ever had any dealings in negotiations, relations, or had at the time any understandings of any kind, oral or written, with the defendant Bemis Corporation here today, or any of its agents, employees, or attorneys which had not been fully disclosed to his other Associates, which was Mr. John D. Wilson and myself.

"There was a short silence after that question. Then he answered 'No'."

Mr. Molloy testified further (Transcript, p. 192):

"The next condition before the signing of the agreement, in the offices of Hale and Dorr, Esqs., on October 19, 1948, I told Mr. Grafton Wilson, who is a member of the firm of Hale and Dorr and who was then assisting Mr. L. H. Green in running the settlement, that I would not sign the agreement under any condition unless I had a letter from Hale and Dorr to me personally absolving me in all respects from this scandalous and scurrilous and libelous and practically criminal allegations that were directed against me and my other associates in the bill of equity.

"Mr. Grafton Wilson assured me that they would send me such a letter."

Again, he testified further in respect to the settlement agreement (Transcript, p. 218):

"A. It was to preserve whatever equity position I had in the corporation at that time as well, and because of the fact that at the time we had the equity action in the State court we had the right under the settlement agreement to recapture, upon certain conditions, the stock which we were required to transfer under the settlement agreement. Also, I had a participating interest myself in the Lynham Industrial Corporation's selling rights pursuant to our tri-partite agreement which your Honor was offered in evidence yesterday."

Finally, on cross-examination (Pages 306 and 307) he stated that he would not have signed the agreement if Gerard had answered in the affirmative the question that he, Molloy, had put to Gerard and that has already been referred to.

It is clear from this testimony that the plaintiff Molloy felt that he was a free agent and that he gained certain advantages from signing and adhering to the settlement contract.

■ The Court finds as a matter of fact that the execution of the settlement contract was not procured by any duress exercised against Molloy or Wilson.

This brings us to the second cause of action, namely, that arising out of the termination of the sales contract between Claremont and Lynham. In accordance with the provisions of the settlement contract, on April 5, 1949, a contract was executed between Claremont of New Hampshire and Lynham Industrial Corporation, whereby Lynham was appointed selling agent for Claremont. The contract stipulated that it might be terminated at any time on 90-days' notice provided that Claremont should not give such notice unless in the opinion of its Board of Directors such action was in its best interests. The evidence tends to show that apparently Claremont, which was now controlled by Bemis, was not satisfied with the performance of Lynham as sales agent and began to sell its product on the market directly through its own employees.

On October 1, 1949, a communication was sent by Claremont to Lynham Industrial Corporation notifying the latter that at a meeting of the Board of Directors of Claremont it was voted that the Board was of the opinion that it was in the best interest of Claremont Paper Corporation that the contract of Claremont Paper Corporation and Lynham Industrial Corporation be terminated, and that accordingly, the agreement referred to would be terminated as of the close of business on December 31, 1949.

■ Lynham endeavors to assert a cause of action for damages against Bemis for causing Claremont to cancel its contract on the theory that Bemis was guilty of unlawful interference with the contract rights of Claremont. It is clear, however, that the cancellation was lawful and in accordance with express provisions of the contract. No wrongful ac—

tion is perceived on the part of either Bemis or Claremont in this respect and the Court so finds.

We now reach the third and last cause of action. The Bemis interests were apparently dissatisfied with the corporate organization. The period during which Molloy and Wilson could redeem a part of their stock expired with nothing being done in that direction on their part. Bemis then felt free to liquidate all of the assets of the corporation, as it evidently desired to do.

The Revised Statutes of New Hampshire, c. 294, sec. 41, permit any business corporation in a meeting duly called for the purpose, by a vote of holders of two-thirds of the stock present or represented by proxy, and voting at the meeting to sell all of its property and assets. A stockholders' meeting was called and held on April 14, 1950. At that meeting the stockholders of Claremont of New Hampshire voted to sell all of its assets. All of the Bemis stock represented by proxy was voted in favor of the dissolution and Molloy's and Wilson's stock was voted against it. Since Bemis held more than two-thirds of the stock the resolution was carried by the required vote. A notice of sale was then published in several newspapers, some of them of national circulation. On June 14, 1950, the assets of Claremont of New Hampshire were sold at auction and were bid in by Bemis for $500,000.

The third cause of action is to set aside this sale as invalid. It is asserted by the individual plaintiffs as a derivative cause of action in their representative capacity in behalf of the corporation. There are two grounds on which it is contended that the sale was invalid.

First, it is charged that the sale was consummated as a result of fraud perpetrated by Bemis. It is, however, a recognized rule of law that fraud must be established by clear and convincing evidence. To be sure, like any other fact, it may be proven by circumstantial evidence, but a mere surmise or suspicion is not enough. Fraud, obviously, is a very serious charge. It is the law of New Hampshire that must govern in the disposition of this issue.

In Jones v. Emery, 40 N.H. 348, 350, it was said:

"Fraud is never to be presumed and must be clearly established by proof. Not that positive and express proof must always be given, for whenever it is manifestly indicated by the circumstances and condition of the contracting parties, it will be presumed. But it will not be implied from doubtful circumstances which only awaken suspicion."

No fraud whatever is discernible in this transaction and accordingly the Court finds as a fact that the sale of the assets of Claremont Paper Corporation of New Hampshire was not procured by fraud and is not tainted with any fraud.

The second ground on which it is alleged that the sale was invalid is a claim that the Bemis proxy used at the stockholders' meeting did not comply with the requirement of the statute and therefore was invalid. That proxy was authorized by the Board of Directors of Bemis and was dated March 19, 1950. It authorized the individuals named to vote the stock held by Bemis at any regular or special meeting of the stockholders of Claremont Paper Corporation to be held on or prior to December 31, 1950. It is urged that this proxy is invalid because it fails to specify in so many words the meeting that was to be held on April 14, 1950.

The Revised Statutes of New Hampshire, Chapter 294, Section 86, provide that stockholders may vote "either in person or by proxy". It is further provided:

"No proxy which is dated more than six months before the meeting named therein shall be accepted, and no proxy shall be valid after the final adjournment of such meeting."

Counsel for the plaintiff argues that it is implied in this section that the proxy must name and identify the specific meeting which is to be held. The Court does not agree. The statute merely provides

in effect that if a meeting is named in the proxy, the proxy may not be used if it is dated more than six months previously. It does not prohibit the use of a general proxy that does not identify a specific meeting, provided, of course, that the proxy would necessarily expire under this provision six months after its issue. In this instance the proxy was voted less than six months after it was executed.

In this connection it must also be noted that while the Court holds that the proxy is valid, the proxy was not challenged at the meeting. There is no doubt that any person at the meeting had a right to call for inspection of proxies and if he reached the conclusion that it was not valid, he had a right to challenge it. Failure to challenge it is a waiver of all objections.

At a later date another proxy was filed by Bemis specifically naming the meeting of April 14, 1950. The Court is of the opinion that this was perhaps superfluous. In any event, it does not affect the problem presented to the Court. The Court, therefore, concludes and finds that there was no invalidity in the sale of the assets of Claremont Paper Corporation of New Hampshire.

It seems well to test the conclusions reached on the basis of findings of fact and the applicable law by what might be called the equities. Each of the two plaintiffs put $333 into the venture involved in this litgation. The plaintiff Molloy for his modest investment received considerable fees for legal services, which he had an opportunity to render, as well as other perquisites, including a share in the profits of Claremont of New York, in an amount that is unknown, be it large or small.

The plaintiff Wilson received a position with a high salary in Claremont of New Hampshire and in addition to that he shared in the profits of Claremont of New York. Actually, what the plaintiffs lost was nothing but an iridescent dream and a fond hope of obtaining affluence on an investment of $333 apiece. No criticism or reflection on them is implied.

They showed considerable business acumen and knowledge, and skill in the field of finance, but they actually lost nothing other than their small investment, which in fact they had recouped many times over.

On the other hand, Bemis put in $900,-000 into the enterprise and later added an additional amount of $200,000. Bemis was the only one who invested any substantial capital into this enterprise which developed into a considerable size. The steps of which the plaintiffs complain in this action were legitimately taken by Bemis in order to protect its substantial financial interest. Therefore, it seems clear that the balance of equities lies with the defendant.

A transcript of this oral opinion will constitute the findings of fact and the conclusions of law. Judgment will be rendered dismissing the complaint on the merits. Counsel may submit a proposed form of judgment.