Cheshire
No. 7928

CHESHIRE OIL COMPANY, INC.

v.

SPRINGFIELD REALTY CORPORATION
AND
BERNARD S. YOUNG

April 7, 1978

*Goodnow, Arwe, Ayer, Prigge & Gardner*, of Keene (*Eric R. Gardner* orally), for the plaintiff.

*Brighton, Fernald, Taft & Hampsey Professional Association*, of Peterborough (*John R. Falby* orally), for the defendants.

DOUGLAS, J.    This is an action in debt to recover damages resulting from the alleged default in the performance of the terms of a promissory note given by the defendants, Springfield Realty Corporation and Bernard S. Young, to Cheshire Oil, Co., Inc. Trial was held before a Master (*Charles T. Gallagher*, Esq.) resulting in a recommendation that the court enter judgment upon a verdict for the plaintiff. The master's recommendation was approved by the court and a decree entered accordingly on May 2, 1977. The defendants moved to set aside the master's report and decree as against the law, the evidence, and the weight of the evidence. The defendants seasonably excepted to denial of their motion and to certain rulings of the

court admitting and excluding evidence and granting and denying certain requests for findings of fact and conclusions of law. All questions of law raised by the foregoing exceptions were reserved and transferred by *King*, J.

In 1971, Springfield Realty Corporation and Bernard Young, the corporation's owner and executive officer, developed plans for construction of a shopping plaza in Peterborough, New Hampshire. Young acquired an option on ten acres of land owned by the Harris Construction Company that was located at the intersection of routes 101 and 202 in Peterborough. He then filed for approval of the shopping plaza with the Peterborough Zoning and Planning Boards.

Young discovered later that the boundaries of the Harris property were only vaguely defined. He approached Cheshire Oil Company, which owned the real estate adjacent to the Harris land, in an attempt to firm up the boundaries. The parties agreed that a boundary line would be established at Young's expense. Cheshire Oil's land that was east of the boundary line would be conveyed to Springfield Realty to be incorporated into the shopping center site. The parties further agreed that the consideration paid for Cheshire's land would be a nominal $200 and that Springfield Realty would lease a site in the shopping plaza to Cheshire to build a gasoline service station. If Cheshire could not obtain the necessary permits for the construction and operation of the gasoline island, however, the purchase price of the land without the lease would be $5,000. This understanding between Young and Cheshire Oil was never formalized into a written contract.

In August 1972, Springfield Realty obtained zoning and planning board approval to begin construction of the shopping plaza. Springfield then proceeded to acquire the Harris property. Contrary to the terms of the option, the deed contained a restriction against the sale of petroleum products on the property. Springfield nevertheless accepted the deed. When Cheshire learned of the restriction, it met with Young to further discuss their deal. Young offered to permit Cheshire to establish a service island in another shopping plaza owned by Young in Ludlow, Vermont, if Cheshire could not get into the Peterborough plaza. Cheshire agreed to this proposal and made application to the Ludlow Planning Board for approval of a gasoline station in the Ludlow shopping center. The first hearing on this application took place on September 27, 1972. On October 12, 1972, the Ludlow Planning Board rejected Cheshire's application.

The closing on the purchase of the Cheshire Oil land was scheduled for October 18, 1972. On that day, or perhaps a day earlier, Cheshire first notified Young that it was raising the price for its land to $25,000 if a permit could not be obtained and a lease entered into for a gasoline station in either the Peterborough or Ludlow locations. The defendants acquiesced and executed the note and agreement in suit, which provided that the purchase price of the land was to be $200 if Cheshire was able to obtain the permits necessary to lease the gasoline island at either or both of the shopping centers, but that if Cheshire was not successful in obtaining the necessary permits and the lease arrangement failed, the purchase price for the land would be $25,000.

On October 20, 1972, the plaintiff applied to the Ludlow Board of Adjustment for an appeal from the denial of its application for a gasoline station permit; this appeal was denied. The plaintiff never made application to the Peterborough zoning or planning authorities for approval of a gasoline station at the Peterborough plaza, nor did the defendant ever take any legal action to remove the restriction against the sale of petroleum products contained in the Harris deed.

Two issues are presented by this appeal. The first is whether the master erred in rejecting the defendants' claim that they were coerced by economic factors to sign the agreement and the note, and that this coercion amounted to "economic duress" sufficient to invalidate the agreement and note.

In this jurisdiction, the payment of money or the making of a contract might be under such circumstances of business necessity or compulsion as will render the same involuntary and entitle the party so coerced to recover the money paid or excuse him from performing the contract. *Morrill v. Bank*, 90 N.H. 358, 9 A.2d 519 (1939); *Malloy v. Bemis Bros. Bag Co.*, 283 F.2d 32 (1st Cir. 1960); *see Annot.*, 79 A.L.R. 655, 657 (1932); 25 Am. Jur. 2d. *Duress and Undue Influence* § 6, at 361 (1966). "[T]he doctrine of duress has gradually expanded ... to cover interference with one's business interests. Such interference, which is considered a species of duress despite its departure from the original common law rules, is generally referred to as the modern doctrine of economic duress or business compulsion." Annot., 79 A.L.R.3d 598, 603 (1977).

In addition to the basic definitional requirement that the coercion be directed toward business interests, the courts have developed further requisites for a finding of business compulsion. First,

one side must have involuntarily accepted the terms of another. "[I]t must appear that the consent was actually induced by the pressure applied and would not have been given otherwise." *Morrill v. Bank*, 90 N.H. at 365, 9 A.2d at 525; *accord,* 13 S. Williston, Contracts § 1618A, at 737 (3d ed. 1970). "This pressure does not . . . have to be such as to overcome the will of a brave or courageous man, or even that of a man of ordinary firmness, but is sufficient if it in fact overcomes the will of the person against whom it is applied." *Morrill v. Bank*, 90 N.H. at 365, 9 A.2d at 525; *see* Annot., 79 A.L.R.3d at 604–05.

■ Second, the coercive circumstances must have been the result of the acts of the opposite party. A contract signed because a party is bargaining under adverse conditions or in pressing want of pecuniary means is not unenforceable on account of duress if the other party is not responsible for those circumstances and did not create those necessities. *Morrill v. Bank*, 90 N.H. at 364, 9 A.2d at 524; *Urban Plumbing & Heating Co. v. United States*, 408 F.2d 382, 389 (Ct. Cl. 1979); *see Healey v. Richman*, 109 N.H. 439, 440, 254 A.2d 844, 844–45 (1969) (per curiam).

■ Third, the pressure must have been wrongful. In *Morrill v. Bank*, this court stated that "there must be some threat to do something harmful which the threatening party has no legal right to do." 90 N.H. at 365, 9 A.2d at 525. This statement was consistent with the view of other courts that a finding of business compulsion could not be predicated upon a demand which is lawful, or upon doing or threatening to do that which a party has a legal right to do. *Kohen v. H. S. Crocker Co.*, 260 F.2d 790 (5th Cir. 1958); *Newland v. Child*, 73 Idaho 530, 254 P.2d 1066 (1953); *Doernbecher v. Mutual Life Ins. Co.*, 16 Wash. 2d 64, 132 P.2d 751 (1943). Many of the courts observing this general statement in principle have nonetheless indicated that an act otherwise lawful could become the basis for a claim of duress if done in bad faith. *See e.g., Morrill v. Bank*, 90 N.H. at 364, 9 A.2d at 524–25; *Doernbecher v. Mutual Life Ins. Co.*, 16 Wash. 2d at 72–3, 132 P.2d at 755; Annot., 79 A.L.R.3d at 606. More recently a number of courts have stated that "[t]he act or threat upon which a claim of coercion is predicated must only be wrongful in a moral sense, not necessarily a legal one." *Gerber v. First Nat. Bank*, 30 Ill. App. 3d 776, 799, 332 N.E.2d 615, 618 (1975); *see, e.g., Fowler v. Mumford*, 48 Del. 282, 102 A.2d 535 (1954). We think that an act or threat may form the basis for a claim

of coercion although the act or threat is not criminal or tortious or in violation of a contractual duty. *See generally* Dalzell, *Duress by Economic Pressure II*, 20 N.C.L. Rev. 341, 361–67 (1942).

Circumstances must have permitted no other alternative but to accept the terms of another if there is to be a finding of business compulsion. *Urban Plumbing & Heating Co. v. U.S.*, 408 F.2d at 389; *W. R. Grimshaw Co. v. Nevil C. Withrow Co.*, 248 F.2d 896 (8th Cir. 1957). Thus if the aggrieved party had a legal remedy adequate to redress or compensate for the injury threatened, the threat will not amount to duress. *Glass & Co. v. Haygood*, 133 Ala. 489, 31 So. 973 (1902); *Oleet v. Pennsylvania Exch. Bank*, 285 App. Div. 411, 137 N.Y.S.2d 779 (1955); 13 S. Williston, *supra* § 1621.

The elements to a finding of duress are questions of law; whether the facts exist to establish those elements in a particular case is an issue for the trial court, and its findings will not be disturbed unless unreasonable. *See Bielinski v. Miller*, 118 N.H. 26, 382 A.2d 357 (1978); *J. J. Morin v. 93 Clearing House, Inc.*, 118 N.H. 52, 382 A.2d 360 (1978). In the instant case, the defendants alleged that "[t]he precipitous change of the terms of the agreement by Cheshire from $5,000 to $25,000 under the circumstances of this case amounts to business coercion." The master found that there had been no coercion sufficient to warrant relief from the agreement. We think that the evidence supports the master's finding.

The evidence tended to establish that Cheshire knew, at the time that it unexpectedly raised the price for its land from $5,000 to $25,000 if it could not obtain approval for a gasoline station at either the Ludlow or Peterborough shopping plaza, that the defendants had already acquired the Harris land and had committed themselves heavily to financing and construction of the Peterborough project. Cheshire's land was necessary in order to define the boundary and obtain title insurance upon which the financing depended. The defendants argue that the plaintiff took advantage of this poor bargaining position of the defendants on the day of the closing, and was responsible for creating the coercive circumstances that compelled the defendants to sign the agreement and note by waiting until all other land acquisitions, financing and construction arrangements had been completed before raising the price for its land. The evidence showed, however, that the defendants had obtained options on the other land involved in the Peterborough project before committing

themselves heavily to financing and construction of the project. With the Cheshire land, they chose to proceed on the basis of an understanding which they knew, or should have known, was not binding. Under these circumstances the master could find that the defendants assumed the risk that the plaintiff might unexpectedly raise the price for its land, and that the plaintiff was not chargeable for the defendants' necessities on the day of the closing. *See Healey v. Richman*, 109 N.H. at 440, 254 A.2d at 844–45.

Nor was a finding that the plaintiff acted wrongfully compelled on the evidence of this case. Although the fact that the plaintiff breached no legal obligation to the defendants in increasing the price for its land is not determinative under the view we take today, this fact was certainly entitled to weight by the master on the question of wrongfulness. There was evidence that the price plaintiff finally demanded for its land was commensurate with the price the defendants had paid for the other land involved in the project.

The other evidence in this case supports the master's finding. Defendant Young is an experienced businessman, knowledgeable in commercial ventures of this kind. The master properly considered that the parties were dealing at arms length and with equal commercial experience in determining the existence of duress. *See Morrill v. Bank*, 90 N.H. at 363, 9 A.2d at 524; *Manno v. Mutual Ben. Health & Acc. Ass'n.*, 18 Misc. 2d 80, 187 N.Y.S.2d 709 (1959). In addition, the defendants had the assistance and advice of counsel at the closing. *See Hastian v. Greenbaum*, 205 Kan. 472, 470 P.2d 741 (1970); *Carrier v. William Penn Broadcasting Co.*, 426 Pa. 427, 233 A.2d 519 (1967). There was also evidence that $25,000 was a reasonable price for the land conveyed. Upon this evidence we cannot say that the master erred in rejecting defendants' claim of economic coercion.

Defendants have also raised in their brief the argument that the provision of the contract providing for a $25,000 purchase price for Cheshire's land is unconscionable and therefore void. This issue, although not raised at trial, is without merit.

The second issue presented by this appeal is whether the master erred in finding that the plaintiff had performed its obligations under the agreement of October 18, 1972. The agreement provided that "[Cheshire Oil Co.] shall, within thirty (30) days from the date hereof . . . apply to the proper municipal, county, state, and other duly constituted authorities for such permits as may be required for the construction, operation and maintenance of a gasoline island at

one or the other or both of [Young's] shopping centers. . . ." Cheshire Oil Co. had three years within which to obtain the permits necessary to the lease arrangement at one or both locations.

The master found that the plaintiff had done all that it could to obtain a permit in Ludlow, Vermont. This finding must stand because supported by evidence that plaintiff applied to the Ludlow Planning Board for approval of the gasoline station before the October 18, 1972 agreement was executed, and that after the agreement was executed plaintiff applied to the Ludlow Board of Adjustment for an appeal from the denial of its application. Defendants argue, however, that under the agreement plaintiff was obligated to make timely application to the Peterborough zoning authorities as well. The express terms of the agreement do not support such a construction, because it provided that Cheshire shall apply for a permit "at one or the other or both" locations. Thus the plaintiff's actions conformed to the plain meaning of the agreement. The defendants contend, however, that at the time the agreement was executed both parties knew that the application to the Ludlow authorities was a "dead issue" and that therefore the agreement should be construed to obligate the plaintiff to use its best efforts to obtain zoning approval from the Peterborough authorities as well.

We need not resolve this question. Even assuming that the agreement obligated the plaintiff to make application to the Peterborough authorities, performance of this condition was excused by virtue of the restriction contained in the Harris deed. "While the performance of the terms of a contract can ordinarily be fully required, still if it can be shown that the performance of the contract was prevented directly or indirectly by the act of the promisee, its non-performance will be excused." *Famous Players Co. v. Salomon,* 79 N.H. 120, 122, 106 A. 282, 283 (1918). In the instant case the master found that the defendants would not have been able to lease to Cheshire the proposed site for the gasoline station in Peterborough even if the plaintiff had obtained the necessary permits in view of the restriction against the sale of petroleum products contained in the Harris deed. This manifest inability of defendants to perform was sufficient to excuse plaintiff from performance of a condition precedent to enforcement of the note. *See* 5 S. Williston, *supra* § 699. The master properly determined whether the circumstances surrounding the making of the contract warranted a finding that the service island could have been located on the unrestricted land conveyed by

Cheshire, or whether Young could reasonably have been expected to remove the Harris restriction within the three-year-contract term. *See Perry v. Company*, 99 N.H. 451, 453, 114 A.2d 885, 887 (1955); *Irwin v. Company*, 95 N.H. 20, 58 A.2d 618 (1948). Because there was evidence to support the master's findings, we cannot say that the restriction contained in the Harris deed was insufficient as a matter of law to excuse the plaintiff from performing its obligation.

Plaintiff's request for double costs and interest pursuant to RSA 490:14-a (Supp. 1975) is denied because the instant appeal is clearly not frivolous.

*Exceptions overruled.*

LAMPRON, J., did not sit; the others concurred.