Sullivan
No. 86-081

BRUCE J. CHASAN & a.

v.

VILLAGE DISTRICT OF EASTMAN & a.

December 8, 1986

808

*Elliott & Jasper*, of Newport (*Louie C. Elliott, Jr.*, on the brief and orally), for the plaintiffs, Bruce J. Chasan, William O. Granville, James F. Lennox, Austin Kovacs, Samuel J. Nicholas, Jr., and Alan Estey.

*Sheehan, Phinney, Bass and Green P.A.*, of Manchester (*Michael C. Harvell* and *Elizabeth T. Luster* on the brief, and *Mr. Harvell* orally), for the defendants, Village District of Eastman, Eastman Community Association, Town of Springfield, Town of Enfield, and Town of Grantham.

JOHNSON, J. The plaintiffs appeal from the granting by the Trial Court (*DiClerico*, J.) of the defendants' motion to dismiss their class action. They contend, *inter alia*, (1) that the trial court erred in finding that the plaintiffs did not establish the existence of contractual

or equitable rights, (2) that certain taxes and charges imposed by the defendants are unreasonable and violative of part I, article 12 of the New Hampshire Constitution, and (3) that RSA 52:1 (Supp. 1985) and RSA 670:3 are unconstitutional as applied to this case. We affirm the dismissal of the plaintiffs' action for the reasons articulated below.

The plaintiffs are property owners in the Village District of Eastman (VDE), which is comprised of adjacent sections of the towns of Grantham, Springfield, and Enfield; but they are not residents of those towns. They are also members of the Eastman Community Association (ECA), which is governed by a board of directors and the ECA Council. The ECA Council is a representative body elected by all Eastman property owners. The board of directors was initially elected by the incorporators at the organizational meeting, and members are thereafter elected by the ECA Council. Approximately ninety percent of all Eastman property owners are non-residents of the village. Plaintiff Chasan, a resident of Pennsylvania, owns two lots, one undeveloped and one with a vacation home. He also owns a one-half interest in an Eastman condominium.

Prior to February 15, 1981, the Eastman Water Company and the Eastman Golf Course were owned and operated by Controlled Environment Corporation, the original developer of Eastman. In 1980, the ECA offered to purchase the water company and the golf course from Controlled Environment. Before consummating the deal, the ECA Board of Directors sent a report to all Eastman property owners regarding the proposed purchase, which set forth, *inter alia*, the price terms of the agreement, along with a detailed explanation of these terms. In its description of the valuation of the water company, the report referred to certain assumptions and projections regarding operating costs and water fee revenues. The ECA board of directors recommended that the outright purchase of the golf course be financed by levying a special assessment against each lot. The revenue thus raised would be used as a down payment to secure interim financing. The ECA board also recommended in its report that a New Hampshire village district be formed pursuant to RSA 52:1 (Supp. 1985) to absorb the municipal functions of the ECA. The report suggested that once formed, the village district would be able to issue tax exempt bonds to cover the purchase price of the water company assets. On February 15, 1981, the ECA voted to approve the purchase of the golf course and water company, and to form the proposed village district.

Following the issuance of the special assessment, the golf course and water company assets were purchased. In accordance with the vote of the ECA Council, the registered voters among the Eastman

owners petitioned the towns of Grantham, Springfield and Enfield to form a village district. On March 20, 1981, a public meeting was held pursuant to RSA 52:2 and RSA 52:3, with those in attendance voting to establish the Village District of Eastman. This action was ratified by the legislature by special legislation. Laws 1981, ch. 198, effective June 3, 1981. The assets of the water company were then transferred to the VDE, which issued the tax exempt bonds. The ten percent or so of the property owners in Eastman that are eligible to vote at village district meetings, *see* RSA 670:3, established *ad valorem* taxes and voted to increase the payments that unimproved lot owners pay for the privilege of having a water system available to them at such time as they choose to utilize it. Plaintiff Chasan attempted to register to vote in VDE elections, but he was refused under RSA 670:3 due to his non-resident status.

Plaintiff Chasan filed a class action in superior court on May 18, 1984, after his individual federal suit was dismissed for failure to state a federal claim. *See Chasan v. Village District of Eastman*, 572 F. Supp. 578 (D.N.H. 1983), *aff'd without pub. opinion*, 745 F.2d 43 (1st Cir. 1984). On October 3, 1984, Chasan filed an amended petition, alleging that the acceptance of the board's report by the ECA membership gives rise to contractual and equitable rights, that a section of the town of Springfield was illegally included in the village district, and that the water rates and charges established by the VDE violate due process. The complaint also pleads a voting rights claim.

Plaintiffs Granville, Lennox, Kovacs, Nicholas and Estey moved to intervene as co-plaintiffs. Their motions were granted, and in December, 1984, the defendants filed a motion to dismiss. After hearing oral argument and considering the complaint and certain other documents referred to by the parties, the court granted the motion. The plaintiffs' appeal raises the following issues for our review: (1) whether it was procedurally proper for the trial court, in dismissing the plaintiffs' action, to base its ruling upon documents submitted by the parties in addition to the complaint; (2) whether the trial court was substantively correct in its ruling that the vote of the ECA, in response to the report submitted by the ECA board, did not create a contract; (3) whether the scheme of development proposed by the ECA for the acquisition and financing of the water company and golf course, considered in conjunction with the covenants for Eastman, created an equitable servitude that was binding on the VDE; (4) whether the water rates, fees, and *ad valorem* taxes imposed by the VDE are violative of part I, article 12 of the New Hampshire Constitution; (5) whether RSA 52:1 requires that a petition presented to the selectmen of a town for purposes of establish-

ing a village district partly in that town be signed by ten registered voters residing in that town; (6) whether, in view of part I, articles 1, 12 and 28 of the New Hampshire Constitution, RSA 52:1 must be so construed; and (7) whether RSA 670:3 is unconstitutional.

■ We reject at the outset the plaintiffs' argument that the court erred in dismissing the complaint without an "evidentiary hearing," after considering documents in addition to the pleadings. The plaintiffs were heard on the motion to dismiss, and were not denied any request to present evidence, and they cannot now complain of a lack of opportunity to be heard further, or to present additional evidence. Superior Court Rule 58 provides that in a hearing on a motion to dismiss, "all counsel shall be prepared . . . to present all necessary evidence." The plaintiffs' argument that the trial court erred in not holding an additional "evidentiary hearing" is without merit. The plaintiffs had an opportunity to argue their case.

■ We next consider whether the trial court erred when it referred to documents submitted with the pleadings in formulating conclusions of law contrary to those alleged in the complaint. A hearing on a motion to dismiss is not, typically, a factual inquiry. M. GREEN, BASIC CIVIL PROCEDURE 108 (1972). Such a motion "challenge[s] the legal sufficiency of the facts which the opponent has alleged . . . . [I]t admits . . . that the facts alleged are true, but it avoids the conclusion the pleader wishes drawn from those facts by pointing out that the facts are insufficient under the law to constitute a cause of action. . . ." Id.; see Hartman v. Town of Hooksett, 125 N.H. 34, 35, 480 A.2d 12, 13 (1984); Hamilton v. Volkswagen of America, 125 N.H. 561, 562, 484 A.2d 1116, 1117 (1984). Normally, a ruling on such a motion is made on the basis of the facts alleged on the face of the complaint. McDowell v. Blythe Bros., 236 N.C. 396, 399, 72 S.E.2d 860, 863 (1952). In the instant case, however, the plaintiffs, having themselves submitted documents along with their briefs in opposition to the motion, cannot object to the court's consideration of those documents in making its ruling. The plaintiffs' "objection" to "summary judgment treatment" of the pleadings is inconsistent with their acts, in submitting documents in addition to the bare pleadings. Having acquiesced in the procedure employed, the plaintiffs cannot now object to the form of the proceeding. Morrill v. Bank, 90 N.H. 358, 359, 9 A.2d 519, 522 (1939).

■■ Ultimately, "the test of the validity of a form of procedure is . . . whether or not it is what justice and convenience require." Id. In this case, consideration of the VDE Council report, along with reference to the Covenants for Eastman, was required in order for

the court to render adequate and informed conclusions of law with respect to the numerous and complex issues in this case. We hold, therefore, that the trial court did not err in considering documents beyond the pleadings.

██ ██ We do not agree with the plaintiffs that the trial court impermissibly refuted factual allegations of the complaint. While it is true that in ruling on a motion to dismiss, all facts properly pleaded are to be deemed true, and all reasonable inferences therefrom are to be construed in the light most favorable to the plaintiff, the plaintiff must nevertheless "plead sufficient facts to form a basis for the cause of action asserted . . . [The court] need not accept statements in the complaint which are merely conclusions of law." *Mt. Springs Water Co. v. Mt. Lakes Village Dist.*, 126 N.H. 199, 200–01, 489 A.2d 647, 649 (1985). Although the complaint expressly alleges that the ECA plan and its adoption created a contract, this allegation represents nothing more than a legal conclusion, the validity of which the court was not required to accept. The court made clear the distinction between legal and factual allegations in rendering its ruling:

> "Contrary to the allegations of the plaintiff, the report, *as a matter of law*, is insufficient on its face to constitute a contract. . . . The necessary elements of a contract have not been alleged. The mere fact that the ECA Council approved the acquisition does not . . . *as a matter of law*, create a contract."

(Emphasis added.)

██ ██ The plaintiffs' reliance upon *Cilley v. N.H. Ball Bearings*, 128 N.H. 401, 514 A.2d 818 (1986) is misplaced. While *Cilley* did hold that a conclusory allegation read together with other allegations may, in a given case, be sufficient to state a claim, the case does not relieve plaintiffs of the duty to state facts sufficient to support a legal claim. In *Cilley*, which involved an appeal from the granting of a motion for summary judgment, the issue was whether the facts as a whole were sufficient to enable a jury to conclude that the plaintiff was wrongfully discharged from his job. In weighing the plaintiff's *factual*, as opposed to legal, allegations, this court found them sufficient to survive the motion, and to go to the jury. We are not confronted with the same quantum or quality of facts in the case at bar, and we find no error. In ruling on a motion to dismiss, it is clearly within the province of the trial court to make legal rulings adverse to the complainant, and to weigh all factual assertions that are relevant to the determination of such rulings.

We next consider whether the trial court erred in its substantive ruling that the plaintiffs' approval of the board's report did not create a contract. The gist of the plaintiffs' allegation is that the ECA board report to the Eastman property owners constituted an "offer" which was "accepted" when the property owners voted to approve the report. We find these contentions devoid of merit.

 An "offer must be so definite as to its material terms or require such definite terms in the acceptance that the promises and performances to be rendered by each party are reasonably certain." RESTATEMENT OF CONTRACTS § 32. "[I]t is an expression by one party of his assent to certain definite terms . . . ." CORBIN ON CONTRACTS § 11, at 23 (1963). We do not think that the language in the report submitted to the Eastman property owners gave rise to a power of acceptance in the plaintiffs. While language is not dispositive in determining whether or not a proposal constitutes an offer, it is worth noting that the report in this case does not itself purport to be an offer. Nowhere in the report does the word "offer" appear. Nor does the language of the report, either in its substance or tone, make any reference to an intention to be bound, or that it was employed in contemplation of legal consequences. *Balfour v. Balfour*, 2 K.B. 571, 579 (1919). Rather, the report merely purports to consist of "assumptions" and "projections" with respect to the rates and charges that the property owners might expect. The issuance of the report to the property owners was not the type of "act that leads the offeree reasonably to believe that a power to create a contract is conferred upon him." CORBIN, *supra* at 25. While it may be true that by voting to approve the report—by "accepting" the board's "offer"—the property owners had the expectation that contractual obligations would result, we do not think such an expectation was reasonable. The "offer" was not definite in its terms, and did not contain language that would lead a reasonable person to believe that a power of acceptance had been created in the property owners.

 The board report in this case is, we think, more in the nature of an expression of an opinion than an "offer" contemplating a contractual relationship. It is well settled that a mere expression of an opinion as to an expectation, however carefully calculated by the party rendering it, is not an offer. *Hawkins v. McGee*, 84 N.H. 114, 115, 146 A. 641, 643 (1929) (statement by doctor regarding length of hospital stay not an offer, but merely a prediction). Courts consider "the importance of the relationship in determining whether the [party] has made a promise or a statement of opinion." J. CALAMARI & J. PERILLO, CONTRACTS 29, n.36 (2d ed. 1977). The ECA Board in this case was acting in essentially an advisory capacity. It

was performing a research and investigatory function for an organization composed not of legally adverse parties dealing at arm's length, but of their own peers, whose hopes and interests were the same. The report of the board to its own peers was not the proposal of a bargained-for exchange, but was a mere reasoned opinion as to the best future course of action. We conclude that a reasonable person in the position of the plaintiffs would not construe the board's report as an offer. "The . . . statements could only be construed as expressions of opinion or predictions . . . and . . . would impose no contractual liability . . . ." *Hawkins v. McGee, supra* at 115, 146 A. at 643.

Further, any "offer" or "acceptance" in this case was not sufficiently bargained for. Consideration is essential to all contracts, *Lang v. Johnson*, 24 N.H. 302, 307 (1851), and may consist either in a benefit to the promisor or a detriment to the promisee, *Corning Glass Works v. Max Dichter Co.*, 102 N.H. 505, 512, 161 A.2d 569, 575 (1960). While the plaintiffs have argued that the plan and vote resulted in "promises, obligations and burdens," we do not think in this case these were tantamount to legal consideration. The vote of the membership of the ECA simply represented a decision by the voters to proceed upon a certain course of action that seemed wise at the time. The report of the board merely constituted the data upon which that decision was based. There was no *quid pro quo*, and certainly no guarantee that the chosen course of action would be successful. The plaintiffs would have this court set right a past course of action that went awry, by straining and manipulating basic contract doctrine. This we will not do. The plaintiffs, having pursued a plan of investment that was carefully conceived, yet fraught with all of the potential risks and pitfalls of enterprise foreseeable to informed and reasonable persons, must bear the consequences of their decision.

Indeed, even if the vote had created a contract, such a contract would certainly not have been binding on the VDE as a successor to the original Eastman Community Association in this case. The VDE was not even in existence at the time the vote took place. Nor is there any evidence on the record that the VDE, as a municipal entity, ever consented to be bound by any contract between the ECA and its members. It is well settled that an unconsenting successor is not bound by contracts between previous parties. *American Fed'n Local 298 v. City of Manchester*, 116 N.H. 665, 667, 366 A.2d 874, 876 (1976). We hold that no contractual obligation existed between the plaintiffs and the Village District of Eastman. Thus, we need not reach the plaintiffs' claim that legislative enact-

ments of the VDE violated the contracts clause of the Federal Constitution. *Kingston v. McLaughlin*, 359 F. Supp. 25, 30 (D. Mass.), *aff'd*, 411 U.S. 923 (1973) (no impairment exists unless there is first a contract).

We next consider whether the scheme of development proposed by ECA for the acquisition and financing of the water company and golf course, considered in conjunction with the Covenants for Eastman, created an equitable servitude that was binding on the VDE, and whether the *ad valorem* tax and increased water charges violated any such servitude. The intent and promise to restrict the use of land are essential elements of an equitable servitude. *Nashua Hospital v. Gage*, 85 N.H. 335, 341, 159 A. 137, 140 (1932). The restriction must be such that it "touches and concerns" the land. *Traficante v. Pope*, 115 N.H. 356, 359, 341 A.2d 782, 784 (1975).

The plaintiffs have not referred to any specific provisions of either the Eastman covenants or the ECA plan in support of their equitable servitude claim. The Eastman Declaration of Covenants and Restrictions makes no reference whatever to any restriction on the formation of a village district to operate the water company and set rates. While article 7.5 of the Declaration of Covenants does provide in pertinent part that "no Owner shall be required to make payments on account of special assessments during any one year in excess of $120 for each lot or Living Unit owned," these provisions are not violated by increased water charges by a subsequently formed municipality. The provisions do not expressly restrict either the means of operating the water company or the setting of water rates. "[A] provision in an instrument claimed to create . . . a servitude is strictly construed, any doubt being resolved in favor of the free use of land." *Town of Vinton v. City of Roanoke*, 195 Va. 881, 893, 80 S.E.2d 608, 615 (1954) (involving a real covenant).

The plaintiffs allege that the plan submitted to the ECA voters creates an equitable servitude, because the report "projects" that "[e]ach lot without a dwelling unit [will continue] to pay the current availability fee of $60 per year." This argument is devoid of merit, for at least two reasons.

First, in order for an equitable servitude to arise, there must be a promise. "[A] 'covenant' is an *agreement* between two or more persons to do or permit the doing of a particular act. . . . It is a *promise*, an agreement or a contract . . . ." G. THOMPSON, THOMPSON ON REAL PROPERTY § 3150, at 59 (1962) (emphasis added). The language in the report is not promissory in nature, but is cast in the form of a "projection." The language in the report does not purport

to create an express promise that water rates would remain constant, but merely renders a projected estimate to that effect. To read such language as promissory strains the plain meaning of the report.

Second, the party that the plaintiffs would find to be under the alleged servitude is not a private party, but a municipality. We agree with the trial court that once the village district was formed, it had all of the authority provided by law to establish, assess and collect water charges. The law permitting the formation of such districts cannot be altered or amended by covenants between parties. Once the water company was acquired by the VDE, it became a public service company, and the State obtained "the power to regulate and control the franchise and to fix rates." *Town of Vinton v. City of Roanoke*, 195 Va. 881, 894, 80 S.E.2d 608, 616 (1954); *see Bacher v. Public Serv. Co. of N.H.*, 119 N.H. 356, 402 A.2d 642 (1979) (except in narrowly defined situations, ratemaking power of PUC is plenary). With respect to the water company, the newly formed village district was free to exercise "all the powers in relation to the objects for which it was established . . . and all that are necessary for the accomplishment of its purposes." RSA 52:3. We hold that the plan and covenants in this case did not give rise to an equitable servitude that was binding on the VDE.

We now consider whether the water rates, fees, and *ad valorem* taxes imposed by the VDE violate part I, article 12 of the New Hampshire Constitution. It is well settled that special assessments upon property for the cost of public services are in violation of our constitution if they are in substantial excess of the benefits received. *Manchester v. Straw*, 86 N.H. 390, 392, 169 A. 592, 593 (1933). There must be special benefits which compensate for the taxes and assessments, and there must be a rational nexus between costs and benefits. *Land/Vest Properties, Inc. v. Town of Plainfield*, 117 N.H. 817, 823, 379 A.2d 200, 204 (1977). It is these benefits that constitute the just compensation required by part I, article 12. The plaintiffs argue that the VDE, in voting to increase water availability fees and establish the *ad valorem* tax, violated this provision.

We begin by noting that the public acts duly issued by the representative bodies of government will be accorded great weight in this court. A representative body is to be afforded deference in the calculation of benefits, *Manchester v. Straw*, *supra* at 393, 169 A. at 594, and its finding is conclusive absent fraud, bad faith or arbitrariness. *Yencing Realty Co., Inc. v. City of Concord*, 116 N.H. 580, 583, 364 A.2d 875, 878 (1976). The plaintiffs have not

alleged fraud or bad faith in this case, and we are left to determine whether the charges were arbitrary.

We do not think the calculation of the charges and the tax in this case was arbitrary or unreasonable in relation to the benefits received. The benefit obtained from having the water system available for future use, and the benefit derived from the presence of the water facilities in the village district, are benefits upon which the charges may be based.

■■■ We hold that the plaintiffs, having the burden to show disproportionality, *Yencing, supra* at 583, 364 A.2d at 878, have not met that burden in this case. Numerous federal cases cited by the plaintiffs are not on point, and in any event need not be discussed here, as the plaintiffs did not raise a federal constitutional claim below. *State v. Westover*, 127 N.H. 130, 131, 497 A.2d 1218, 1219 (1985) (this court will not consider arguments not specifically raised below).

■■ ■■ We next turn our attention to the language of RSA 52:1 (Supp. 1986) to determine whether that statute requires, as the plaintiffs have alleged, that a petition to form a village district partly in a town, presented to the selectmen of that town, be signed by ten registered voters in the same town. The inquiry must begin with the statutory language itself. *In re Robyn W.*, 124 N.H. 377, 379, 469 A.2d 1351, 1352 (1983). The language is to be interpreted according to its plain meaning, *In re Richard M.*, 127 N.H. 12, 17, 497 A.2d 1200, 1204 (1985), and the law is to be construed as a whole, *Plymouth School District v. State Bd. of Educ.*, 112 N.H. 74, 78, 289 A.2d 73, 76 (1972). We conclude that application of these canons of construction to RSA 52:1 does not yield the interpretation that the plaintiffs advocate. The statute provides that

> "[u]pon the petition of 10 or more legal voters, inhabitants of *any* village situated in *one or more towns*, the selectmen of the town or towns shall fix, by suitable boundaries, a district including such town or towns as may seem convenient. . . ."

RSA 52:1 (Supp. 1986) (emphasis added). Clearly this language does not require the selectmen to be served with a petition signed by ten voters from their own town before they may act. The statute expressly provides that the voters of "*any* village" in "one *or more* towns" may petition the selectmen. The plaintiffs have cited no cases or legislative history declaring that the statute should be construed otherwise. Absent an indication of legislative intent to the contrary, the language of the statute controls. *Appeal of Concord Natural Gas*

*Corp.*, 121 N.H. 685, 433 A.2d 1291 (1981) (absent an indication of legislative intent to the contrary, the word "shall" acts as a command).

 We do not agree with the plaintiffs that the statute construed according to its plain meaning is "contrary to all notions of representative government." The entire statutory scheme, when viewed as a whole, "in harmony with the law of which it forms a part," *State v. Millette*, 112 N.H. 458, 465, 299 A.2d 150, 154 (1972), belies this contention. Under section 2 of the act, once the voter petition is filed, the selectmen are required to "call a meeting of the legal voters residing in the district to see if they will vote to establish the district." RSA 52:3 provides that "[a]t such a meeting the legal voters may by vote establish the district." Thus the legal voters residing in a proposed village district make the decision relative to the establishment of the district. In the instant case it was, after all, the legal voters of the plaintiffs' own village district that established the taxes and charges about which the plaintiffs complain. Further, in acting on the petition, the selectmen of a given town must exercise a duty "to act fairly and honestly and to exercise their best judgment in reaching a decision." *Attorney General v. Littlefield*, 78 N.H. 185, 188–89, 98 A. 38, 41 (1916). We therefore conclude, based upon the law viewed as a whole, that RSA chapter 52 is not contrary either to our democratic values, or to our constitution. Since we hold that there was no constitutional defect in the formation of the VDE pursuant to RSA chapter 52, we need not consider whether the legislative ratification of that procedure, *see* Laws 1981, ch. 198, "cured" the defect.

We now reach the plaintiffs' claim that under the circumstances of this case, RSA 670:3 deprives them of the right to vote, in violation of part I, article 1 of the New Hampshire Constitution. The plaintiffs argue that because the VDE's "sole purpose" is to supply water to property owners in Eastman, and that because Eastman property owners are as interested in the affairs of the VDE as are non-residents, it is irrational to deny voting rights to non-residents. We find this claim to be without merit.

 It is well settled that the right to vote is not absolute. *Levitt v. Attorney General*, 104 N.H. 100, 107, 179 A.2d 286, 291 (1962), and that the exercise of the franchise is subject to reasonable regulations established by the legislature, *State v. Sullivan*, 101 N.H. 429, 430, 146 A.2d 1, 3 (1958). Further, it is clear that States have unquestioned authority to require voters to be residents of the relevant political subdivision. *Holt Civic Club v. City of Tuscaloosa*, 439 U.S. 60, 68–69 (1978).

"No decision of this Court has extended the 'one man, one vote' principle to individuals residing beyond the geographic confines of the governmental entity concerned, be it the State or its political subdivision. On the contrary, our cases have uniformly recognized that a government unit may legitimately restrict the right to participate in its political processes to those who reside within its borders."

*Id.*

 Unlike the statute struck down by the United States Supreme Court in *Dunn v. Blumstein*, 405 U.S. 330 (1972), RSA 670:3 does not deny the franchise to bona fide residents. We think this is a crucial distinction for purposes of part I, article 1, and that a statute that does not "den[y] the franchise to individuals who [are] physically resident within the geographic boundaries of the governmental entity concerned," *Holt Civic Club v. Tuscaloosa, supra* at 68, is not constitutionally infirm. Part I, article 11 of the New Hampshire Constitution expressly accords the franchise to "inhabitant[s] of the state."

 We do not agree with the plaintiffs that RSA 670:3 is irrational or arbitrary as applied to this case merely because ninety percent of the property owners in Eastman are non-residents, who purchased in reliance on covenants and enjoy full participation in the affairs of the community association. These factors do not outweigh the legitimate policies inherent in RSA 670:3. The fact remains that the plaintiffs are not residents of the locality concerned. "The question is not where a person has a . . . desire to vote, . . . but where the law considers him best qualified to exercise his political rights and privileges." *Moore v. Teller*, 409 S.W.2d 813, 815 (Ky. 1966). RSA 670:3, which prescribes bona fide residency among a legal voter's qualifications, has several important objectives. It insures that the voters are most likely to be cognizant of the full range of issues confronting the community. It designates those citizens who are likely to be the most informed of the needs of the particular community. It assures that the voter has a common interest in all matters pertaining to the government of the subdivision and that the franchise will be exercised intelligently. As the court noted in *Howard v. Skinner*, 87 Md. 556, 559, 40 A. 379, 380–81 (1898):

"The object in prescribing residence as a qualification for the exercise of the right to suffrage . . . is not merely for the purpose of identifying the voter and as a protection against fraud, but also that he should become in fact a

member of the community and as such have a common interest in all matters pertaining to its government."

*Id.* A bona fide residency requirement serves as "a modicum of protection against those who . . . have no intention of establishing a *permanent* residence in the area, and hence have little incentive, interest or opportunity to become informed voters on the community needs." *Wright v. Davis Mountain Hospital District*, 214 Or. 141, 153, 328 P.2d 314, 320 (1958) (emphasis added).

The plaintiffs argue that because non-resident property owners receive the ECA newsletter and certain special mailings, there is no reason to claim that non-residents are not well informed of VDE affairs. Receipt of miscellaneous "potpourri" contained in a community association mailing is not equivalent to the level of participation available to the permanent residents of a community involved in the day-to-day affairs of the political subdivision.

▮▮▮ We reject the plaintiffs' argument that the VDE is a "special limited purpose municipal district" in which voting rights should be determined by property ownership rather than residency. While it is true that the law elsewhere has recognized the existence of such districts, none has been created in this case. Such districts are the creatures of express statutory enactment. *See Associated Enterprises Inc. v. Tottec Watershed Improvement District*, 410 U.S. 743 (1973) (involving "watershed district" expressly created by Wyoming Watershed Improvement District Act); *Salyer Land Co. v. Tulare Water District*, 410 U.S. 719 (1973) ("water storage district," expressly organized pursuant to the California Water Storage District Act). Such districts are authorized by statute in order to provide local response to particularly severe water problems. These "special limited purpose" districts, once duly formed, are authorized to create projects "for the acquisition, appropriation, diversion, storage, conservation, and distribution of water." CALIF. WATER CODE § 42200 *et seq.* "The actual adoption of district projects is long and involved." *Salyer Land, supra* at 723 n.3. The plaintiffs have not pointed to any comparable New Hampshire statute in this case, and in any event have not availed themselves of any "special" procedure that would either create a "special limited purpose district" or vest the right to vote in property owners alone. The plaintiffs argue that because the VDE was formed in contemplation of RSA 52:1, I(d) (Supp. 1986), which provides that a village district may be formed for the purpose of "the supply of water for domestic . . . purposes," the VDE should be considered a limited purpose district for voting purposes. Subparagraph I(d), however, must be read in the context of the entire section, which nowhere provides for the vesting of vot-

ing rights based upon property ownership. We hold that the plaintiffs have not demonstrated that the VDE is a special limited purpose municipal district, and that their voting rights claim must fail.

In closing, the plaintiffs in this case knew or should have known of the risks and uncertainties involved in proceeding upon the course of action of creating a village district in which only local residents would have the right to vote. In setting up a bona fide village district under appropriate statutory procedures, the plaintiffs apparently believed that their interests would thus be best served, particularly as to the issuance of bonds at favorable interest rates. Under the circumstances, however, there were no guarantees. The fact that their "plan" did not work quite as expected, and that their expectation was not perfectly realized, does not, without more, convert their expectation into a claim for legal or equitable relief.

*Affirmed.*

All concurred.