U.S. District Court
No. 87-197

ANTHONY T. PANTO

v.

MOORE BUSINESS FORMS, INC.

August 5, 1988

*Kathleen Laude Kerr*, of Concord, and *Richard M. Howland P.C.*, of Amherst, Massachusetts (*Richard M. Howland & a.* on the brief, and *Mr. Howland* orally), for the plaintiff.

*Shaines & McEachern*, of Portsmouth, and *Goldstein & Manello*, of Boston, Massachusetts (*Michael R. Brown & a.* on the brief, and *Mr. Brown* orally), for the defendant.

SOUTER, J. The United States District Court for the District of New Hampshire (*Devine*, C.J.) has certified the following questions, as amended, for our consideration under Supreme Court Rule 34:

"1. Does plaintiff's amended complaint (1) state a cause of action recognizable under New Hampshire law; (2) which may be maintained despite the factual stipulation that the 'expressed written policy agreement,' as alleged in the

amended complaint, was unilaterally promulgated by the defendant?

2. If the answer to the first question is 'yes,' what are the elements of proof which must be established to enable an at-will employee to recover damages for the breach of such contract?"

The plaintiff, Anthony T. Panto, is an erstwhile employee of the defendant, Moore Business Forms, Inc., who seeks enforcement of the "written policy agreement" to the extent that it would entitle a laid-off at-will employee, qualifying under its terms, to a continuation of his salary and to the benefit of Moore's contributions to pension and insurance plans for three months after lay-off.

■ In answering the district court's questions, we hold that an employer's unilateral promulgation to present at-will employees of a statement of intent to pay and provide such economic benefits may be recognized under New Hampshire law as an offer to modify their existing relationship by means of a unilateral contract, which offer is subject to such an employee's acceptance by continued performance of his duties. The essential elements of such an agreement are not peculiar either to employment contracts, or to contracts formed by an employee's continued discharge of pre-existing duties following his employer's announcement that the relationship will thenceforth carry enhanced remuneration. Our opinion will discuss those standard contractual elements in the course of concluding that the allegations of Panto's amended complaint can be read to permit proof of facts indicating that the parties formed a unilateral contract, entitling Panto to the economic benefits in question for three months after ending his employment with Moore.

The district court's certified questions in this diversity action, *see* 28 U.S.C. 1332, come to us following Moore's motion to dismiss an amended complaint ostensibly stating a claim under State law. The district court ruled against Moore, to the extent that it felt able to respond to the motion without an opinion from us. The court then prepared questions for our determination under Rule 34, in order to obtain a more certain legal basis for a final ruling on the dismissal motion. After these questions had been certified to us, however, Moore once again moved for dismissal in the district court, this time claiming preemption of State law by congressional enactment of the Employee Retirement Income Security Act (ERISA), 29 U.S.C. §§ 1001–1461. Panto's response was a second motion to amend, by adding a claim under ERISA. The district

court granted Panto's motion to amend, and dismissed the State count previously alleged. Despite the demise of the State law claim, the district court denied Moore's further motion to vacate the certification as moot.

Moore has pursued its mootness claim here as well, and, for the same reasons it first directed to the district court, it now urges us to vacate our acceptance of the questions. This we decline to do. While our decision whether to accept a question is not foreclosed by the district court's decision to send it, we place much weight upon the district court's views in deciding for ourselves whether a transferred question should be answered. In this instance, the district court reasoned that Panto's ultimate entitlement to relief will still depend on the existence of a substantive contractual obligation, so that our answers to the State law questions remain necessary. We will defer to the district court's ruling and will respond to the transferred questions by assuming the truth of the allegations of the complaint as first amended, *see Chasan v. Village District of Eastman*, 572 F. Supp. 578, 579 (D.N.H. 1983), *aff'd without opinion*, 745 F.2d 43 (1st Cir. 1984) (on motion to dismiss, allegations of material fact to be taken as admitted and construed in light most favorable to the plaintiff), and as supplemented by such stipulations as the order of certification contains.

The following factual basis for our answers is so derived. Moore hired Panto in 1974 and for some twelve years employed him at-will, in the sense that either party was free to end the relationship with or without cause at any time. *See Cloutier v. A. & P. Tea Co., Inc.*, 121 N.H. 915, 919, 436 A.2d 1140, 1142 (1981). By March, 1986, Panto had come to hold the position of Equipment Engineer in the Manufacturing Engineering Department at Moore's Dover, New Hampshire, factory. In the fall of 1985, operating losses from the Dover plant prompted Moore to plan to reduce the work force there by some ten percent, and in October the company unilaterally promulgated to some or all of the Dover employees a written policy statement entitled "Layoffs and Returns," in preparation for layoffs the following month. The plaintiff received a copy.

Although Panto was not laid off in November of 1985, the reduction in work force that month led to reorganization of the Manufacturing Engineering Department. Panto has described one incident of that reorganization as the abolition of his job as Equipment Engineer, although the defendant has characterized the change as a mere "revision" of the original position. Whatever the better description may be, by February, 1986, the result for Panto was a job entitled "Senior Production Engineer" with duties

different from those formerly required of the "Equipment Engineer." Panto chose not to accept the new position and resigned, claiming to be laid off for purposes of the lay-off and recall policy and therefore entitled to benefits described in Moore's written policy statement.

Although that policy statement is not in all respects a paradigm of draftsmanship, its general structure and specific provisions are reasonably clear. It bears a date of October 30, 1985, and applies, by its terms, "[w]hen a reduction in the work force is necessary. . . ." It provides generally that the order in which any employees are to be laid off will be determined by seniority, subject to the company's reserved "right to retain juniors doing essential jobs" and to respond to "unforeseen situations . . . on an individual basis." The policy statement assumes that the elimination of some positions will present their incumbents with a choice to take other jobs with the company or to leave its employment, and the statement provides that "[i]f an employee refuses to accept an available job, he/she will be laid off." It is this provision, Panto claims, that brings him within the class of employees to whom the policy was directed.

The statement proceeds to address benefits, by language that can be read to promise all laid-off employees a three-month continuation of group life, health, and dental insurance coverage on the same terms that obtained during employment. The statement then speaks to the procedure for recalling laid-off employees, by providing generally that "[i]f, within six months of layoff, it is necessary to increase the work-force, employees who have been on layoff for six months or less shall be considered for employment . . . ." After describing administrative procedures for recall, the statement concludes with two attachments referring to salary payments after lay-off. The first includes a provision that can be read to indicate that "exempt employees" with more than five years of service will be entitled to continued salary payments for three months after lay-off. The second attachment concerns "non-exempt" employees with at least one year of service, who will be entitled to "severance pay" based on length of employment, to be made "at the end of the six month recall period—May 23, 1986."

This factual background not only sets the stage for the principal issues raised by the district court's questions, but also foreshadows a threshold problem to be dealt with before going any further. Moore objects that Panto is entitled to nothing, because he could not reasonably be found to be within the class of employees addressed by the written policy, leaving aside the question whether the policy is enforceable by a member of that class.

Moore invokes two quite separate grounds for this position, the first being that the policy was meant to apply only to those who would be laid off in November, not to those who might depart later, as the plaintiff did the following March. There are two answers to this. The first is that the district court seems to have considered the point already and to have held in Panto's favor. As we read the ruling on the motion to dismiss, delivered prior to certifying the questions to us, the district court decided that the pleadings stated a claim for relief on the assumption that New Hampshire law would enforce an employer's unilateral promulgation of employment policy. The district court's determination assumed, then, that the plaintiff had alleged membership in the class to whom the policy was addressed.

Having so said, however, we also admit that the litigation can probably be dispatched more efficiently if we do not try to draw too nice a line between what the district court has implicitly passed upon and what that court wishes us to address under the questions certified. We have therefore looked to the merits of the objection ourselves, and agree with the district court's apparent conclusion that the pleadings can be read to allow Panto to prove facts that would bring him within the class of intended beneficiaries. It is arguable, to be sure, that the policy statement's reference to the six-month recall period as ending on May 23, 1986, was an indication that affected employees would be laid off on November 23, 1985. But it is true likewise, that the policy assumed some lay-offs would result from employees' refusals to accept new job assignments, and one cannot say as a matter of law that the policy required such employees to make their choices no later than November 23. At the least, there is ambiguity on the face of the document, to be resolved by the trial court.

The defendant's second ground for excluding the plaintiff from the class of beneficiaries stresses the view that the plaintiff's old position was not "abolished, but rather was revised," with the result that he was not offered a new position, and therefore could not be treated as laid off by refusing to accept it. But this is just word play, since there is no express recognition of the abolition-revision distinction in the policy statement. Whether the revision was so significant as to amount to the old job's abolition is a question of fact for the district court's resolution.

With this matter behind us, we can address the more significant issue raised by the first question, whether the defendant's statement of terms of employment, unilaterally promulgated to someone who is already an at-will employee, is or can become enforceable by the

employee. As confined to the claim raised in the amended complaint, the question is whether an at-will employee may enforce his employer's announced undertaking to provide continuations of salary, pension, and insurance benefits for a limited period after the employee's possible lay-off in the foreseeable future.

As we have already indicated summarily, we answer that the unilateral announcement of the provisions in question here may be treated as an offer subject to an employee's acceptance, to be expressed by the continued performance of his duties, upon which an enforceable unilateral contract term will be formed. The respective statements of the employer and conduct of the employee can thus be understood to conform to the classic course of unilateral contract formation, in which the offeror makes what is understood to be a promise to be bound upon an offeree's acceptance as manifested by conduct indicated in the offer. *See Sawyer v. Railroad*, 62 N.H. 135, 157 (1882); *Janvrin v. Exeter*, 48 N.H. 83, 84 (1868); RESTATEMENT (SECOND) OF CONTRACTS § 50(2), comment *b* at 128 (1981). The application of ordinary standards of contract formation to the facts alleged and stipulated confirms this conclusion.

We ask first whether the allegations about the promulgation of the policy statement entitle Panto to prove facts that would indicate an intent on Moore's part to be bound to perform its stated intention. *Chasan v. Village District of Eastman*, 128 N.H. 807, 815, 523 A.2d 16, 21 (1986). We believe that such an inference is possible from the very fact, as alleged, that the communication occurred between employer and employee, parties whose contractual relationship is governed by terms characteristically articulated by the employer, *Small v. Springs Industries, Inc.*, 292 S.C. 481, 484–85, 357 S.E.2d 452, 454 (1987), except in instances covered by collective bargaining agreements. Because compensation and fringe benefits are usual incidents of this contractually governed economic relationship, it is generally true that a statement on these subjects by the party who pays the compensation can be viewed objectively, *see McConnell v. Lamontagne*, 82 N.H. 423, 425, 134 A. 718, 719 (1926), as meant to be a subject of binding agreement. The possibility of such an interpretation can claim a further measure of support from the clarity of the provisions in question here, which are sufficiently certain to allow claims of breach to be resolved readily, *see Sawin v. Carr*, 114 N.H. 462, 465, 323 A.2d 924, 926 (1974); RESTATEMENT (SECOND) OF CONTRACTS § 33(2), and to enable a reasonably certain computation of damages, *see Whitehouse v.*

*Rytman*, 122 N.H. 777, 780, 451 A.2d 370, 372 (1982); RESTATE-
MENT (SECOND) OF CONTRACTS, *supra* § 352.

Moore seeks to counter any inference of intent to be bound by
arguing that no employer would have meant to assume an
enforceable obligation to pay three months of benefits for only three
more weeks of work (assuming the anticipated lay-off date of
November 23). But we have already noted above that the class of
employees who can enforce the policy may not necessarily be
limited to those laid off three weeks after Moore promulgated the
policy. Even if the class were so confined, however, three weeks of
work from the employees ultimately laid off is not necessarily all
the defendant would have expected. If the employees knew the
Dover plant was unprofitable and reductions in work force were
likely, most of them would probably have been well-advised to look
for more dependable employment, and the evidence may indicate
that it was to counter this inducement to leave that Moore
undertook to insure salary and benefits for three months. By
promising benefits to the then-unidentified ten percent of the work
force, Moore could be seen as acting to ensure employment stability
among the other ninety, a calculation obviously consistent with an
objectively inferred intent to be bound.

Next we ask whether acceptance by Panto of the proffered terms,
and the provision of legally adequate consideration, are likewise
open to proof consistent with the allegations. We have held on
similar facts that continued service by an employee who is free to
leave his job at any time may be seen as consideration for an
employer's offer to modify employment terms favorably to the
employee, *see Gilman v. County of Cheshire*, 126 N.H. 445, 449, 493
A.2d 485, 488 (1985), just as the employee's continuation on the job
is the very act by which he accepts the offer, *see Duldulao v. St.
Mary of Nazareth Hospital Center*, 115 Ill. 2d 482, 490, 505 N.E.2d
314, 318 (1987). So, in the instant case, Panto, as an at-will
employee, without tenure or any obligation to continue working for
Moore, allegedly continued his work for more than four months
after the policy on post-layoff benefits was communicated to him.
Proof, therefore, of such service may be taken to demonstrate both
acceptance of the offer and consideration for the promise to pay
benefits, just as clearly as the employee's continued labor was
regarded in *Gilman* as acceptance and consideration sufficient for
enforcement of modified employment terms calling for payments
in lieu of accumulated sick leave. *See Gilman v. County of Cheshire*,
*supra* at 450, 493 A.2d at 489.

In sum, the allegations of the amended complaint, taken with the stipulations, are sufficient to allow proof of the elements of unilateral offer, acceptance, and consideration resulting in enforceable contract terms like those exemplified in *Gilman.* The plaintiff should be entitled to an opportunity to prove facts on which damages may be awarded.

But we cannot end the matter here. For anyone who is aware of the recent proliferation of litigation over the enforceability of employment terms contained in manuals or handbooks, circulated by employers to at-will employees, may sense something simplistic in the hornbook summary of the law as we have just given it. Indeed, each party to the instant case has assumed that what we will call the "handbook cases" are closely enough in point to exert a gravitational pull on our resolution of the issues before us. Although we do not share that assumption, we need to explain why we do not.

The handbook cases characteristically arise on actions brought by at-will, or formerly at-will, employees who seek to enforce the provisions of handbooks circulated by their employers and indicating that employees will be accorded some measure of job security. *See generally,* Note, *Protecting At-will Employees Against Wrongful Discharge: The Duty To Terminate Only In Good Faith,* 93 HARV. L. REV. 1816 (1980); Lopatka, *The Emerging Law of Wrongful Discharge—A Quadrennial Assessment of the Labor Law Issues of the 80's,* 40 BUS. LAW. 1 (1984). As we observed before, such an employee enjoys no job security, in the sense either of entitlement to retain the job except on proof of some substantive cause to fire him, or of entitlement to be warned of or heard prior to an impending discharge. Hence, an employer who distributes a handbook to allegedly at-will employees indicating that they will not be fired without cause, or without the benefit of some administrative due process, states in effect that he will no longer treat the relationship as being literally at-will. When such an employer thereafter fires one of the affected employees without proof of cause to do so, or without the benefit of the procedure described in the manual, litigation over the enforceability of the manual's provisions naturally tends to ensue.

Judicial responses to actions for the enforcement of job security provisions contained in handbooks fall into four broad categories. In the first, courts enforce a manual's terms if, but only if, they satisfy generally applicable standards of unilateral contract formation. The terms must be reasonably understood as an offer manifesting an intent to be bound, upon acceptance by the

continuing labor of a present employee to whom the offer is addressed and who knows of the offer's terms. *Pine River State Bank v. Mettille*, 333 N.W.2d 622 (Minn. 1983), for example, applied the same analysis to discharge provisions that we have applied to provisions for compensation and benefits, and that case holds that a pre-existing contract for employment at will can be modified by the agreement of the parties in a subsequent unilateral contract for employment with job security. *Id.* at 627.

The second judicial response recognizes the enforceability of the handbook's statement of policy, but without so clearly requiring compliance with unilateral contract rules. Thus, for example, *Woolley v. Hoffmann-La Roche, Inc.*, 99 N.J. 284, 491 A.2d 1257 (1985) speaks of a manual's discharge-for-cause provisions as being contractually enforceable, *id.* at 297, 491 A.2d at 1264, at the same time the opinion follows *Toussaint v. Blue Cross & Blue Shield of Michigan*, 408 Mich. 579, 292 N.W.2d 880 (1980) in holding that the manual's terms may be enforced even if the parties' minds have never met and even if the plaintiff was not even aware of the manual's provisions. *Id.* at 613, 292 N.W.2d at 892; *Woolley, supra* at 304, 491 A.2d at 1268. Whether these latter observations were intended to express anything beyond the view that contract formation is to be judged objectively is debatable, and is of no concern to us here. What is clear is that *Pine River* and *Woolley* typify the two strains of explanation now constituting the majority view, that handbook provisions for job security are, or can become, enforceable so as to affect an employee's previously at-will status. *See Small v. Springs Industries, Inc.*, 292 S.C. at 485–86, 357 S.E.2d at 455 (citing Annot., 33 A.L.R. 4th 120 (1984)).

A third group of cases enforce manual provisions by relying on the theory of promissory estoppel, under which a promise reasonably understood as intended to induce action is enforceable by one who relies upon it to his detriment or to the benefit of the promisor. *See* RESTATEMENT (SECOND) OF CONTRACTS § 90 (1981). *Compare Morgenroth & Assoc's, Inc. v. Town of Tilton*, 121 N.H. 511, 514, 431 A.2d 770, 772 (1981) *with Blue Cross/Blue Shield v. St. Cyr*, 123 N.H. 137, 144, 459 A.2d 226, 230–31 (1983). Because we do not understand Panto's pleadings to raise an estoppel claim, we will say no more here about this theory of enforcement.

Finally, handbook cases of the fourth sort adopt a variety of reasons for rejecting efforts to enforce modifications of at-will relationships claimed to have resulted from the employer's circulation of written statements of employment policy. *See* Note, HARV. L. REV. *supra*; Annot., 33 A.L.R. 4th 120, 125 (1984). *Ferraro*

*v. Koelsch*, 119 Wis. 2d 407, 350 N.W.2d 735 (1984), and *Shaw v. S.S. Kresge Co.*, 167 Ind. App. 1, 328 N.E.2d 775 (1975), illustrate the structure of many cases with such results, in that each relies on a restrictive view of adequate consideration in order to conclude that representations about job security to at-will employees are immune to unilateral contract enforcement resting on the employee's continued performance of his pre-existing duties.

There is, however, little reason for Moore to invoke supporting authority from cases holding to this last view. First, and most obviously, the handbook cases focus on the tension between the employer's unfettered authority to discharge an employee who is assumed to be at-will, and the limitation on that power allegedly derived from the employer's announcement that he will modify his discretion to some degree. Either the employee is at-will, or he is entitled to keep his job until the employer complies with the provisions for job security. There is, however, no such simple either-or exclusiveness between at-will status and entitlement to post-layoff salary and fringe benefits. There is no claim in this case that Moore cannot lay Panto off; Panto simply wants the payments and benefits that Moore represented its laid-off employees would receive. The terms at issue are essentially provisions for deferred compensation, the enforceability of which were established in *Gilman v. County of Cheshire*, 126 N.H. 445, 493 A.2d 485, and the enforcement of which would limit Moore's discretion only by requiring payment of the price Moore proposed to pay when it might lay employees off.

 Second, even if the handbook cases from other jurisdictions were closer to the point, prior New Hampshire law furnishes no predicate for assuming we would adopt the view that what an employer chooses to call a policy statement is immune to the customary rules of contract formation. It is, of course, true that we continue to recognize the rule that an "indefinite hiring is *prima facie* a hiring at will," *Cloutier v. A. & P. Tea Co., Inc.*, 121 N.H. at 919, 436 A.2d at 1142 (quoting H. G. WOOD, A TREATISE ON THE LAW OF MASTER AND SERVANT § 136, at 283–84 (2d ed. 1886)), in the absence of "legislative and judicial exception [or a] collective bargaining agreement . . . ," *id.* at 919–20, 436 A.2d at 1142; *see also Howard v. Dorr Woolen Company*, 120 N.H. 295, 414 A.2d 1273 (1980); *Monge v. Beebe Rubber Co.*, 114 N.H. 130, 316 A.2d 549 (1974); RSA chapters 275 and 354-A. But it is crucial to recognize what is explicit in *Cloutier*, that our cases speak of an at-will rule as one of *prima facie* construction, whereas the cases from other jurisdictions in category four effectively treat the at-will rule as one

of substantive law, which the parties are not free to modify in accordance with the usual rules of contract. Thus, even with respect to a job security provision, the defendant would hardly find comfort in the at-will rule as this State has recognized it.

This last observation may acquire some emphasis after a look at Moore's specific contentions reflecting the reasoning of handbook cases in the fourth category. Moore argues, for example, that no contractual modification of the at-will relationship could have occurred here, because the policy statement proposed no "bargained-for exchange." *See Chasan v. Village District of Eastman*, 128 N.H. at 816, 523 A.2d at 22. We take this point as an allusion to cases holding that modification of an at-will contract in an employee's favor must rest on some consideration separate from the consideration for the employer's preexisting obligations to the employee. *See, e.g., Ferraro v. Koelsch*, 119 Wis. 2d 407, 350 N.W.2d 735; *Johnson v. National Beef Packing Co.*, 220 Kan. 52, 551 P.2d 779 (1976); 9 S. WILLISTON, CONTRACTS § 1017, at 134–35 (3d ed. 1967).

As we have already observed, however, whatever force this position might command in a case dealing with job security (and we think it would have little force there), it has none in a case dealing with deferred compensation. A modification of an existing contract by adding an obligation to pay deferred compensation arises in the same way the basic obligation to compensate arises: the employer in effect tells the employee that someone who works will be paid so much, and the employee works on that assumption. If the theory of unilateral contract were inadequate to hold an employer to a promise to enhance remuneration by deferred compensation, it is difficult to see how it could hold him to pay simple wages in the first place.

Moore simply mistakes what the law means by a bargained-for exchange as a condition of contract. The requirement has nothing to do with the separability of elements of consideration in relation to elements of the promisor's obligation. It means simply that the promisor must manifest an intent to induce a promise or performance and the promisee must manifest a corresponding intention. RESTATEMENT (SECOND) OF CONTRACTS § 81(2), comment *a*. As we held in *Gilman*, there is no inconsistency between that intent on the part of a promisor and an at-will promisee's response by continuing to do what he has done before.

Next, Moore argues that the policy is unenforceable in contract for want of consideration, the employee being under no obligation to continue to work. What Moore fails to see, however, is that Panto does not claim the right to the deferred compensation because he agreed to remain at work for any particular period; he simply claims that the lay-off policy is reasonably interpreted as an agreement to pay certain benefits to those who remain at work until laid off within the time period covered by the policy. The consideration was remaining at work, not agreeing to remain at work; and, from an employee at-will, that is consideration adequate to support the promise. *Gilman v. County of Cheshire,* 126 N.H. 445, 493 A.2d 485.

Again, it appears that Moore has uncritically taken this objection from the job security context, where courts encounter the argument that an employer should not be bound to keep the employee if the latter is not bound to stay. *Compare Shaw v. S.S. Kresge Co.,* 167 Ind. App. at 7, 328 N.E.2d at 779, *with Pugh v. See's Candies, Inc.,* 116 Cal. App. 3d 311, 171 Cal. Rptr. 917 (1981). Even in that context, however, the argument merely expresses a demand for consideration equivalent in character or value to the contractually enforceable promise, and such is not our law. *See Burgess v. Queen,* 124 N.H. 155, 160, 470 A.2d 861, 865 (1983); 1A CORBIN, THE LAW OF CONTRACTS § 200, at 215 (1963); RESTATEMENT (SECOND) OF CONTRACTS §§ 3, 79(b), 80, comment *a; see also Pine River State Bank v. Mettille,* 333 N.W.2d at 629; *cf. Reynolds v. Chase,* 87 N.H. 227, 231, 177 A. 291, 294 (1935) (inadequacy of consideration irrelevant except as evidence bearing on some other element affecting validity). Thus, two promises may be enforceable for the price of one, if that is what the parties agreed.

 Moore compounds this erroneous view in arguing that the policy should be unenforceable, lest Panto or some other employee reap a windfall. In speaking of a windfall here, Moore is not referring to a mere unexpected gratuity. Panto does not suggest that the policy would be contractually enforceable if Moore had announced it contemporaneously with the lay-offs; Panto himself is alleged to have worked for four months after Moore announced the terms, and even those laid-off in November worked at least an additional three weeks. Rather, the windfall that Moore has in mind is an employee's receipt of a benefit that did not in fact induce him to continue in his employment up to the moment of layoff. The short answer to this is that the law of contract applies objective standards to interpret the evidence upon which contractual obligation rests, *McConnell v. Lamontagne,* 82 N.H. at 425, 134 A. at 719, and the fact that a promise is not the subjective inducement for a plaintiff's

performance is no bar to its enforcement, RESTATEMENT (SECOND) OF CONTRACTS § 81(2).

Moore's remaining assertions may be dealt with summarily. It suggests that we should not create a contract merely to compensate Panto for his unequal bargaining power. We agree, in relying on a unilateral contract analysis. The point here is not to adjust obligations to mitigate the effects of bargaining weakness, but to enforce the obligations that the parties may reasonably be said to have agreed upon. Our holding is in line with *Pine River State Bank v. Mettille*, not with the arguably interventionistic passages in *Woolley v. Hoffmann-La Roche.*

Nor is the defendant's plea for certainty in the law at all to the point. Moore would have us skew the normal principles of contract to allow it to escape liability, whereas Moore could simply have avoided the entire issue by announcing in the written policy itself that it was not an offer, or a policy enforceable as a contractual obligation. *See Mau v. Omaha National Bank,* 207 Neb. 308, 314, 299 N.W.2d 147, 151 (1980). It is the defendant that has the option of certainty in the power to say only what it means; the source of Moore's discomfort is not the law's uncertainty but its demand for candor.

Nor do we see merit in Moore's suggestion that in some circumstances our position could result in imposing obligations on unwilling employees. We are not certain what Moore has in mind, and we are content here to recognize an employee's power to refuse an offer against his interest, just as the employer is responsible for his own interest in deciding on the content of any offer he makes.

Finally, we have no occasion to deal with Moore's plea to give only prospective application to any new law we announce, by which we understand the defendant to mean that Panto himself should not be allowed to recover. There is nothing new about the rules of unilateral contract or about their application to post-employment compensation. *See Gilman v. County of Cheshire,* 126 N.H. 445, 493 A.2d 485. *See generally Merrill v. Manchester,* 114 N.H. 722, 730–31, 332 A.2d 378, 384 (1974) (new rule applied in case that announced it).

■ We answer yes to the first certified question; and to the second question we answer that the required elements of proof are the elements of unilateral offer, acceptance, and consideration.

*Remanded.*

All concurred.